**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

**February 6, 2024**

**Christopher M. Wolpert**
**Clerk of Court**

ORP SURGICAL, LLC, a Colorado
limited liability company; LEE
PETRIDES,

      Plaintiffs - Appellees/Cross-
      Appellants,

v.

HOWMEDICA OSTEONICS CORP.,
a New Jersey corporation,

      Defendant - Appellant/Cross-
      Appellee.

Nos. 22-1430; 22-1455

_____

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 1:20-CV-01450-RBJ)**
_____

Marcy G. Glenn (Maureen R. Witt and Nicholas W. Katz, Holland & Hart LLP,
Denver, Colorado, and Michael D. Wexler, Seyfarth Shaw LLP, Chicago,
Illinois, with her on the briefs) of Holland & Hart LLP, Denver, Colorado, for
Defendant - Appellant/Cross-Appellee.

Todd E. Mair (Christopher P. Carrington with him on the briefs) of Richards
Carrington, LLC, Denver, Colorado, for Plaintiffs - Appellees/Cross-
Appellants.
_____

Before **PHILLIPS**, **KELLY**, and **ROSSMAN**, Circuit Judges.
_____

**PHILLIPS**, Circuit Judge.
_____

This litigation arises from the breakdown of a profitable business relationship that ended with a cohort of disgruntled employees jumping ship from one company to the other. At a bench trial, two corporations engaged in the medical-device-sales industry levied claims and crossclaims against each other for breach of their two sales agreements, governed by New Jersey law. After trial, the district court entered judgment for ORP Surgical, LLC (ORP), and awarded damages, attorneys' fees, sanctions, and costs against Howmedica Osteonics Corp., referred to throughout this litigation by the name of its parent company, Stryker.

Before this court, Stryker challenges the district court's rulings that Stryker breached the sales agreements and that ORP did not. Stryker also contests the attorneys' fees award, arguing that the district court misconstrued New Jersey law as requiring Stryker to indemnify ORP. On cross-appeal, ORP challenges the court's awarding mere nominal damages—not compensatory damages—for Stryker's breach of the non-solicitation/non-diversion provision under one of the agreements.

We affirm in part and reverse in part. As to the judgment entered for ORP on the breach-of-contract claims and all crossclaims and the award of nominal damages, we affirm. As to the attorneys' fees awarded under the indemnification provision, we reverse. We therefore vacate the attorneys' fees award and remand for further proceedings consistent with this opinion.

**BACKGROUND**

I.     **Factual Background**

Stryker makes medical devices and sells them to hospital surgeons. ORP is a Colorado-based company that sells medical devices throughout the region. Lee Petrides is the sole Manager of ORP and a named plaintiff in this litigation.

In the early 2000s, ORP and Stryker entered into a successful business relationship in which ORP sold Stryker's products in the Colorado region on commission. Though Stryker also sold some products in the region through its own sales subsidiary, Summit Surgical, a substantial portion of the regional sales were carried out by ORP sales representatives ("ORP reps" or "the reps"). ORP reps "require[d] a specialized skillset" to sell Stryker's products. *ORP Surgical, LLP v. Howmedica Osteonics Corp.*, No. 20-CV-01450, 2022 WL 4298189, at *1 (D. Colo. Aug. 15, 2022). Successful sales depended on the reps developing "relationships with the surgeons to whom they sell" and "sufficient medical knowledge to advise and guide the surgeons in the use of Stryker products from inside the operating room." *Id.* The upshot is that Stryker and ORP worked closely together. These companies and their employees knew each other intimately and relied on one another to succeed.

ORP sold two types of Stryker products: joint replacements and trauma devices. For each of the two product types, ORP and Stryker entered a sales contract, the Joint Sales Representative Agreement (JSRA) and the Trauma

3

Sales Representative Agreement (TSRA), collectively, "the SRAs." These contracts mirror each other, particularly the sections at issue in this appeal.

The SRAs contain these provisions, summarized as follows:

- Section 2:
  Either party may terminate the contract for "any reason, or no reason," with a 30-day written notice, and "in accordance with the provisions in Section 15." App. vol. 7, at 1475, 1500.

- Section 6.1:
  ORP will "use best efforts" to promote Stryker's products and "develop [Stryker's] goodwill within the [sales territory]." *Id.* at 1476, 1501.

- Section 6.2:
  ORP has the "right to determine the means, methods, and resources" it "deems appropriate to sell and promote" Stryker products in its designated sales territory, provided that ORP "conduct itself and perform such activities to the standards and satisfaction of Stryker." *Id.*

- Section 6.3:
  ORP may not "directly or indirectly" promote or sell products competitive with any of Stryker's products, except for those included in a list of "Exempt Products" attached to the TSRA, which products ORP may sell to further Stryker's best interest in servicing the needs of its client hospitals and surgeons. *Id.*

- Section 6.4:
  Except for the "Exempt Products" attached to the TSRA, ORP cannot sell any products that compete with Stryker's products, but "nothing contained herein in any way limits [ORP's] unfettered right to represent, market, distribute or sell products that are not competitive with any of [Stryker's products] or that do not conflict with the best interests of [Stryker]." *Id.* at 1477, 1502.

- Section 7.3:
  ORP will ensure at its own expense that "all [ORP reps] acting on behalf of [Stryker] in the [sales territory] comply with any

4

rules, regulations and policies imposed by [Stryker's] customers." *Id.* at 1478, 1503.

- Section 13.11:
  ORP warrants that each ORP rep will "comply with all applicable laws, rules and regulations of any local, state, and federal governmental body, agency or board having jurisdiction." *Id.* at 1481, 1506.

- Section 15.1:
  Either party may terminate the contract "upon the occurrence of any . . . breach of any provision of this Agreement that is not cured within ten (10) business days after receipt of written notice thereof from the other Party." *Id.* at 1484, 1509.

- Section 16.1:
  For one year after the end or termination of the agreement, ORP agrees not to compete, that is, "participate, in any manner whatsoever, in the sale, promotion, marketing, distribution or delivery of medical device products to or for any person" in Stryker's sales territory, and ORP agrees not to solicit Stryker's customers or employees. *Id.* at 1485–86, 1510–11.

- Section 16.2 (non-solicitation/non-diversion provision):
  Stryker agrees that for one year after termination of the agreement it will "not directly or indirectly divert or solicit, or attempt to divert or solicit, any current employee or independent contractor working for [ORP]." *Id.* at 1486, 1511.

- Section 16.3:
  During the one-year noncompete period, Stryker will "make payments to [ORP] on a monthly basis (the '[r]estriction [p]ayments') in an amount equal to one-twelfth (1/12) of the aggregate commissions paid to [ORP] by [Stryker]" for twelve months before the agreement terminates. *Id.*

- Section 16.4:
  Stryker is released from paying ORP the restriction payments if Stryker terminates the agreement for "cause," with "cause" defined as any breach of the terms or conditions in the agreement, among other things. *Id.*

- Section 18 (indemnification provision):
  "Either party shall indemnify, defend, exonerate, and hold the other harmless" for "any and all claims, suits, liability, loss, costs, expenses (including . . . reasonable attorneys' fees and expenses)." *Id.* at 1487, 1512.

- Section 22 (non-waiver provision):
  Either party's failure "to enforce any provision(s) of this Agreement shall not constitute or be construed as a waiver of the provision(s)." *Id.* at 1488, 1513.

This relationship began in 2001 and worked well for many years; in August 2018, the parties renewed the SRAs.

But everything started to go downhill in October 2018, when a Houston-based Stryker employee, Adam Jacobs, became Stryker's new Vice President of Sales for the Rocky Mountain region. In late March 2019, Jacobs terminated the JSRA for cause. Because the termination was for cause, Jacobs claimed that, under Section 16.4, Stryker needn't pay the restriction payments. In response, ORP denied any breach and insisted that Stryker pay the restriction payments.

In June 2019, Jacobs approached Petrides with new proposed terms for terminating the JSRA: Stryker would agree to pay ORP the twelve months of restriction payments if ORP agreed to waive the non-solicitation/non-diversion provision covering the reps. Stryker wanted ORP to waive the provision so that Stryker could hire James Demorset, an ORP sales rep. Petrides rejected the offer. But then, in October 2019, Stryker hired Demorset anyway.

6

Earlier, in September 2019, Jacobs emailed Petrides to initiate a "mutually agreeable termination" of the TSRA. App. vol. 7, at 1563. Jacobs pitched Petrides two alternatives for terminating the TSRA: (1) ORP would be subsumed as Stryker's agent; or (2) Stryker would buy out ORP for $8 million, pay no restriction payments, and be free of the non-solicitation/non-diversion provision.

At this point, Jacobs and Petrides met at a Starbucks to discuss the termination offer. During this meeting, Petrides wrote his terms on a sticky note, counteroffering to settle for $13.6 million. Petrides claims that Jacobs accepted the offer then and there; Jacobs claims that he told Petrides he was generally amenable to a deal but that he needed to consider the specific terms.

During the next few months, Jacobs frequently communicated with ORP reps through phone calls, dinners, and in-person meetings. Then, on March 31, 2020, Jacobs emailed Petrides with a proposal for $13.6 million, conditional on ORP's promise to waive the non-solicitation/non-diversion provision so that Stryker could hire fourteen ORP reps. To reach the $13.6 million sum, Stryker offered an initial $8 million for the cost of terminating the TSRA and ORP's waiving the non-solicitation/non-diversion provision, plus an additional dollar amount for each rep it acquired from ORP. Thus, the $13.6 million depended on Stryker getting all the reps it wanted from ORP.

According to Petrides, Jacobs declared that he would terminate the TSRA for cause unless the parties had a signed deal by that Friday, April 3, 2020. Jacobs denied ever threatening Petrides to sign the proposed buyout deal.

On April 3, 2020, Petrides instead voluntarily terminated the TSRA. Petrides apparently sought to beat Jacobs to the punch. The April 3, 2020 termination started the 30-day clock under Section 2, meaning that absent a cure of the breach, the TSRA would officially terminate at 11:59:59 p.m. on May 3, 2020. That evening of April 3, 2020, Jacobs emailed all the ORP reps about the TSRA's termination and notified them that Stryker personnel would be reaching out to discuss the "transition." App. vol. 9, at 1662.

The next day was eventful. Beginning in the early morning hours, Jacobs's email to his so-called ORP "dream team" was met with a near-instantaneous flurry of responses from ORP reps expressing their desire to join Stryker. For the next month, as shown by phone records and email logs, Stryker executives frequently contacted ORP reps. Some of these conversations included discussions of the noncompete language in ORP contracts, questions about Stryker's offering legal representation, and inquiries about Stryker's online job applications.

A month later on May 4, 2020, mere hours after the TSRA officially terminated, a dozen ORP reps emailed their resignations to Petrides and accepted offers at Stryker. Within the month, ORP sued Stryker.

## II.    Procedural Background

In its final amended complaint, ORP made six claims for relief, two of which were tried before the district court: breach of contract and corporate raiding.[1] Stryker answered with several counterclaims: breach of contract under both SRAs, unfair trade practices, and tortious interference of contract, which specifically identified Stryker's former employee, Morgan Schilling.[2]

During an eight-day bench trial, the district court heard testimony from the key players: Petrides, Jacobs, ORP reps (Matthew Corcoran, Ryan Dunn, James Beddall, Brett Bakersky, Hayden Spellbring, Austin Olson, Craig Frey, Parthenios "Peter" Henderson), and Stryker executives (Tim Sebald, Michael Bonessi, Scott Curtis). ORP also called witnesses to defend against Stryker's counterclaims, including Dr. Mark Tuttle, one of Stryker's surgeons, who testified to the differences between Stryker's products and similar products

---

[1] In its final amended complaint, ORP also raised claims for unjust enrichment, intentional interference with existing contractual relationships, intentional interference with prospective business relations, and violation of the Colorado Wholesale Sales Representatives Act, Colo. Rev. Stat. § 13-21-1303 (2023). ORP voluntarily dismissed three of these claims before trial, and the parties agreed to dismiss the fourth during a pretrial conference.

ORP separately sued the reps that fled to Stryker. Those cases have settled.

[2] Stryker sued Morgan Schilling, former Trauma Sales Manager at Summit Surgical, separately in New Jersey federal district court. A New Jersey federal magistrate judge ordered the case to mediation, set for February 2024. Text Order, *Howmedica Osteonics Corp. v. Schilling*, 20-CV-09621 (D.N.J. Oct. 4, 2023), ECF No. 187. At the time of this writing, discovery in that case is ongoing.

from other manufacturers. The court also heard testimony from competing damages experts.

The district court entered judgment for ORP on the breach-of-contract claims and all counterclaims. After entry of the final judgment, ORP moved under Rule 59(e) for the court to alter or amend its judgment to deny Special Master's fees and to award actual damages for Stryker's soliciting Demorset. Similarly, Stryker moved under Rules 52(b) and 59(e) for the court to not award ORP attorneys' fees under the SRAs' indemnification provision and to make two clarifications related to the prejudgment interest award.[3]

The district court granted in part and denied in part the parties' post-trial motions. On attorneys' fees, the district court declined Stryker's request to modify the judgment. Interpreting the indemnification provision under New Jersey law, the court again ruled that the provision encompasses first-party indemnity claims. But the court did amend the judgment to clarify the award of prejudgment interest, as Stryker requested.[4]

---

[3] Stryker's post-trial motion raised two challenges related to prejudgment interest: (1) the docket entry for the court's "Final Judgment" was not, in fact, final because prejudgment interest was undetermined; and (2) New Jersey law required the court to identify the equitable considerations in favor of awarding prejudgment interest, which it failed to do.

[4] In response to Stryker's motion, the court amended the docket entry from "Final Judgment" to "Judgment," and it added a footnote to its amended findings that articulated the equitable interests supporting the prejudgment interest award, in accordance with New Jersey law. App. vol. 5, at 1120 n.10

(*footnote continued*)

In response to ORP's motion, the court agreed with ORP that the Special Master's fees were subsumed under the existing attorneys' fees award, and that some other form of sanctions was needed to compensate ORP for Stryker's discovery misconduct. So the court amended its order to award "attorney's fees and costs incurred in the related state court litigation as a result of Stryker['s] . . . discovery misconduct." App. vol. 5, at 1060. And finally, regarding Demorset, the court denied ORP's request for damages because ORP had failed to prove that Stryker solicited Demorset in breach of the JSRA.

Accordingly, the court entered an amended findings of fact, conclusions of law, and order of judgment. *See ORP Surgical*, 2022 WL 4298189, at *1. Those amended findings and conclusions are the basis of this appeal.

The judgment was amended twice more in response to additional post-trial motions on attorneys' fees, sanctions, costs, and prejudgment interest, which are not relevant to the substantive issues raised on appeal.[5] The district

---

(quoting *W.R. Huff Asset Mgmt. Co. v. William Soroka 1989 Tr.*, No. 04-CV-3093, 2009 WL 2436692, at *1 (D.N.J. Aug. 6, 2009)).

[5] The district court's initial findings of fact, conclusions of law, and order of judgment were entered on May 10, 2022. *ORP Surgical, LLP v. Howmedica Osteonics Corp.*, No. 20-CV-01450, 2022 WL 1468115 (D. Colo. May 10, 2022). Both parties then filed various post-trial motions to amend or alter the judgment. The district court amended its findings of fact and conclusions of law accordingly, and on August 15, 2022, entered its final findings and conclusions. *ORP Surgical*, 2022 WL 4298189, at *1. After another round of post-trial motions, the court entered an amended judgment on August 22, 2022, which ordered Stryker to reimburse ORP for 90% of its reasonable attorneys' fees for the costs incurred in recovering spoliated

(*footnote continued*)

court entered an order dispensing with these remaining post-trial motions, and it separately entered an amended order and final judgment (1) in favor of Stryker on the corporate raiding claim, (2) in favor of ORP on the breach-of-contract claims and all counterclaims, and (3) awarding attorneys' fees, damages, costs, sanctions, and prejudgment and post-judgment interest in these amounts:

- *Actual damages* awarded to ORP for the unpaid restriction payments due in the amount of $1,018,896.00 under the JSRA and $3,731,791.47 under the TSRA;

- *Nominal damages* for $1.00 awarded to ORP for Stryker's breach of the non-solicitation/non-diversion provision under the TSRA;

- *Reasonable attorneys' fees* awarded to ORP, authorized by Section 18 of the SRAs, equaling $2,285,951.50;

- *Discovery sanctions* awarded to ORP for $70,473.85—equaling 90% of ORP's reasonable attorneys' fees and costs incurred for the recovery of spoliated evidence— ¾ to be paid by Stryker, ¼ to be paid by Stryker's counsel;

- *Costs* awarded to ORP equaling $98,366.22;

- *Prejudgment interest* awarded to ORP equaling $446,456.12; and

---

evidence during the state court litigation. App. vol. 5, at 1133–35. On November 14, 2022, the court entered its second amended order and judgment on the amount of attorneys' fees, sanctions, costs, and prejudgment interest. *ORP Surgical, LLP v. Howmedica Osteonics Corp.*, No. 20-CV-01450, 2022 WL 16924068 (D. Colo. Nov. 14, 2022). And finally, on December 27, 2022, the court entered its third and final judgment, which resolved all remaining filings, evidence, arguments, and motions related to the award of attorneys' fees, sanctions, costs, and prejudgment and post-judgment interest. *ORP Surgical, LLP v. Howmedica Osteonics Corp.*, 647 F. Supp. 3d 1068 (D. Colo. 2022).

- *Post-judgment interest* to be awarded according to federal rates established under 28 U.S.C. § 1961(a).

App. vol. 7, at 1428–30. *See generally ORP Surgical, LLP v. Howmedica Osteonics Corp.*, 647 F. Supp. 3d 1068 (D. Colo. 2022).

The parties filed timely notices of appeal and cross-appeal.[6] We have jurisdiction under 28 U.S.C. § 1291.

## DISCUSSION

Stryker presents three issues on direct appeal and ORP presents one issue on cross-appeal. Stryker claims that the district court (1) erred in fact and law in ruling that ORP breached neither of the SRAs and, relatedly, that Stryker lacked cause to terminate the JSRA; (2) misinterpreted New Jersey law in ruling that Section 18 of the SRAs covers first-party indemnification claims; and (3) erroneously awarded ORP damages beyond those proved.

On cross-appeal, ORP claims that the district court erred by awarding mere nominal damages for Stryker's solicitation and diversion instead of compensatory damages.

---

[6] ORP and Stryker prematurely filed notices of appeal before the district court had resolved all post-trial motions and determined a sum certain amount of prejudgment interest. Accordingly, this court dismissed those appeals for lack of jurisdiction. *ORP Surgical, LLC v. Howmedica Osteonics Corp.*, Nos. 22-1289, 22-1320, 2022 WL 19039680, at *1 (10th Cir. Oct. 26, 2022). Both parties then filed timely notices of appeal and cross-appeal after the district court entered its third amended and final judgment.

I.    **Stryker's Factual Arguments**

Stryker argues that (1) ORP's purported breach of the JSRA gave Stryker cause to terminate the contract, and (2) ORP breached the TSRA, eliminating any responsibility for Stryker to pay the restriction payments. Stryker disputes the district court's ruling that ORP breached neither contract and that Stryker indeed owed ORP the restriction payments. Specifically, Stryker alleges that the district court committed seven factual errors—four in applying the JSRA and three in applying the TSRA.

As a threshold matter, we observe that many of the district court's findings in this case rested on credibility determinations of the testifying witnesses. Overall, the district court remarked that it found Stryker's witnesses "lacked credibility." *ORP Surgical*, 2022 WL 4298189, at *7. We give those findings the broad deference they deserve. *Martin v. Gingerbread House, Inc.*, 977 F.2d 1405, 1408 (10th Cir. 1992) (citing *Anderson v. City of Bessemer City*, 470 U.S. 564, 575 (1985)). Yet we acknowledge that not all of Stryker's fact-based arguments depend on credibility. So we proceed to tick through each of Stryker's claims of error, grouping them according to the SRAs.

A.    **Standard of Review**

We will not set aside fact-findings from a bench trial absent clear error. *Ryan v. Am. Nat. Energy Corp.*, 557 F.3d 1152, 1157 (10th Cir. 2009). To assess whether a clear error has been made, "we must view the evidence in the light most favorable to the district court's ruling and must uphold any district

14

court finding that is permissible in light of the evidence." *Ramos v. Banner Health*, 1 F.4th 769, 777 (10th Cir. 2021) (cleaned up).

### B.    The JSRA

Stryker contends that it terminated the JSRA for cause and thus does not owe ORP twelve months of restriction payments. Under Section 16.4, Stryker owed ORP restriction payments if Stryker terminated without "cause." App. vol. 7, at 1486. The district court determined that ORP did not breach the JSRA, that Stryker had no cause to terminate, and that therefore restriction payments were due. On appeal, Stryker alleges that these findings were clear error.

First, Stryker argues that it had cause to terminate the JSRA because in November 2018 one of Stryker's client hospitals suspended Scott Stapleford, an ORP joint-device-sales rep and part owner of ORP. The district court found this was immaterial and most likely a "post-hoc legal justification[]" for terminating the contract. *ORP Surgical*, 2022 WL 4298189, at *5. The court was persuaded by evidence that Stryker had known about Stapleford's suspension for months before terminating the JSRA, that Stryker's own reps had been suspended by hospitals with no disciplinary response, and that Stapleford had been "too-ardently defending the Stryker business," but not necessarily adversely to Stryker's interests. *Id.*

Stryker argues on appeal that Stapleford's behavior established cause to terminate the JSRA. Stryker contends that the district court erred by ignoring

15

the "neutral" testimony of Scott Curtis, former General Manager of Summit Surgical, who recounted Stapleford's wrongdoings at trial. Op. Br. at 18.

But viewing the evidence favorably to the district court's decision, we conclude that Curtis's testimony bolsters the court's finding. Curtis testified that Stapleford almost single-handedly grew Stryker's joint-device-sales business, which earned the company millions. He conceded that Stapleford was a talented sales rep. And Curtis confirmed that Stryker knew about Stapleford's suspension in November 2018 yet waited until March 2019 to terminate the JSRA. For these reasons, Curtis's testimony supports the inference that overlooking Stapleford's suspension served Stryker's best interests. So we disagree that the district court's placing more weight on Curtis's testimony would have changed the outcome.

Second, Stryker alleges that ORP breached the JSRA because Stapleford sold competitive products to Stryker's clients. This failed to convince the district court for two reasons. One, there was no evidence in the record to prove that Stapleford actually *sold* the product to the hospital. Two, the testimony at trial contradicted Stryker's claim that the products were competitive with each other.

Stryker calls foul because the JSRA prohibited ORP reps not just from *selling* competitive products, but also from *delivering* or *distributing* them. And Stryker insists the evidence shows that the product—a hip stem made by another company, Link—was competitive. Again, the record is not on Stryker's

16

side. We acknowledge that the evidence shows Stapleford provided one of Stryker's surgeons, Dr. Tuttle, with a Link hip stem after Dr. Tuttle requested it. But there is no evidence that Stapleford *sold* the hip stem to Dr. Tuttle. And even if he delivered or otherwise provided it, as Stryker alleges, the evidence shows that the Link hip stem was not a competitive product. Dr. Tuttle testified that the two hip stems were not interchangeable. And even Jacobs admitted that some patients require the Link hip stem over Stryker's analog because Stryker's design can risk causing their femurs to crack. So we see adequate evidence in the record to buoy the district court's finding that the Link hip stem and Stryker's product were not competitive with each other, and thus Stapleford's furnishing the Link hip stem to Dr. Tuttle was no cause for termination.

Third, Stryker claims that ORP's delay in reporting its year-end invoices in December 2018 created cause to terminate the JSRA. The district court rejected this argument too, persuaded by testimony showing that the misreporting was a genuine clerical error by ORP. And "most importantly," the court noted, Stryker hired Demorset—the individual "most responsible for the invoice issue, which it would not have done had it believed [Demorset] willfully defrauded Stryker." *ORP Surgical*, 2022 WL 4298189, at *4.

Stryker argues that, regardless of ORP's intentions, the delinquent invoices per se violated the JSRA's requirement that ORP comply with Stryker's internal policies. But the evidence supports the district court's finding that this argument is a red herring. In early January 2019, Curtis

17

reprimanded Petrides for the late invoices; Petrides explained what happened: Demorset was newly trained on the reporting software and had simply made a mistake, Demorset accepted full responsibility, and Stryker dropped the matter. So the district court had good reason to wonder about Stryker's claim that the invoices justified terminating the JSRA in March 2019 after the issue was apparently resolved in January 2019.

Fourth and finally, Stryker alleges that Stapleford's insubordination to Curtis gave Stryker cause to terminate. The district court rejected this argument. In doing so, the court noted that Stapleford's pugnacious business style was known at ORP and Stryker throughout his career, yet accusations of "insubordination" never arose before this lawsuit. *Id.* at *5.

We agree that the record refutes Stryker's argument, at least in part because it's not clear that Stapleford can be fairly described as Curtis's subordinate. Curtis admitted as much in his own testimony. Stapleford was historically unpleasant to work with, true enough, but the district court did not clearly err in determining that his alleged insubordination gave no cause for Stryker to terminate the JSRA.

Because the record supports the district court's finding that Stryker lacked cause to terminate the JSRA, Stryker was not excused from making the restriction payments to ORP.

18

C.    The TSRA

Petrides's voluntary termination of the TSRA triggered Section 16.3 of the contract, which required Stryker to make restriction payments to ORP. But Stryker seeks refuge under Section 16.4, arguing that ORP's previous breach relieved it of responsibility for those payments. The district court found no breach, which Stryker argues was clear error.

First, Stryker alleges that ORP breached the TSRA when it sold a competitive product to client hospitals. The allegedly competitive product (the SegWay product) was a scope used for carpal tunnel procedures. In 2017, Stryker purchased a company (Instratek) that made a comparable product. When the parties renewed the TSRA in August 2018, the SegWay product was not listed as an approved competitive product for ORP reps to sell because Stryker wanted the reps promoting Instratek's version.

But the district court found that Stryker failed to provide ORP with adequate inventory and training sufficient to supply clients with the Instratek product. This failing persisted after ORP reps requested the necessary resources from Stryker. The court also noted that the SegWay sales comprised a mere $150,000 of ORP's total $25 million Stryker sales in 2019. The court therefore concluded that Stryker's "tacit consent" to ORP's sales of the SegWay product defeated any retroactive justification for withholding the restriction payments. *Id.* at *6.

19

Before this court, Stryker maintains that the SegWay product was not an approved competitive product for ORP reps to sell under the TSRA, whether Stryker gave its "tacit consent" or not. Op. Br. at 42. But this argument fails because the record contains an email thread that exhibits precisely what ORP complained about: ORP requested inventory and training from Stryker for the Instratek product; Stryker knew that ORP was selling SegWay's product in the interim to meet client demands; and yet, Stryker failed to supply ORP with Instratek inventory. There is no contradictory evidence in the record. Further, Section 6.4 of the TSRA states that "nothing contained herein in any way limits [ORP's] unfettered right to . . . distribute or sell products . . . that do not conflict with the best interests of [Stryker.]" App. vol. 7, at 1502. This provision sanctions ORP's decision to continue supplying Stryker's hospitals—an act clearly in Stryker's best interests—despite Stryker's failure to give ORP inventory from its preferred manufacturer. We have no reason to overturn the district court's finding on this point.

Second, Stryker claims that ORP violated Stryker's Trauma Inventory Agreements (TIAs), contracts between Stryker and the hospitals. It did so, allegedly, by reducing the hospitals' shelf space for Stryker products and lending more space to Stryker's competitors. The district court dismissed this claim for insufficient evidence. It also noted that ORP was not party to the TIAs, implying that it would be unfair to hold ORP to those agreements.

20

On appeal, Stryker characterizes the district court's finding as "stunning" in view of testimony from ORP reps Frey and Henderson. Op. Br. at 45. But the district court specifically found that Frey and Henderson were not credible witnesses, and we see no basis to overrule that assessment. *See Acosta v. Paragon Contractors Corp.*, 884 F.3d 1225, 1234 (10th Cir. 2018) (noting the "great deference" we extend to the district court's credibility determinations (citation omitted)). Because this argument rests entirely on witness testimony that the district court found not credible, we cannot properly review it, let alone reverse for clear error on this ground.

Third and finally, Stryker alleges that Morgan Schilling, a Stryker employee and former owner of ORP, promoted ORP's interests over Stryker's in violation of ORP's contractual duty to advance Stryker's best interests. Stryker also argued that Schilling misrepresented his financial stake in ORP. Yet the district court found that Stryker failed to tether this alleged coverup by Schilling, a *Stryker* employee, to *ORP's* compliance with the TSRA. The court noted too that Stryker knew about Schilling's close relationship with Petrides and ORP. Most of all, the court admonished Stryker that its "claims against Mr. Schilling belong in the New Jersey case, not here."[7] *ORP Surgical*, 2022 WL 4298189, at *6.

---

[7] At the time of this writing, the New Jersey litigation is ongoing, see footnote 2.

21

We agree that these claims are most appropriately adjudicated in

Stryker's separate litigation with Schilling. And even if we were inclined to

address them here, we would not find the district court clearly erred. Stryker's

statements that Schilling acted as ORP's agent are entirely conclusory, and its

characterization of Schilling's activities is unsupported by the evidence.[8] The

district court thus decided correctly that the Schilling arguments were

misplaced and factually unsound.

None of the alleged factual errors Stryker identifies amount to clear

error. And so, we move on to address Stryker's legal claims.

## II.    Stryker's Legal Arguments

Beyond its factual allegations, Stryker argues that the district court made

several subsidiary legal findings that require us to reverse. These allegedly

erroneous legal findings break down into three categories: materiality, waiver,

and lay opinion. More specifically on each, Stryker claims that the district

---

[8] Stryker's main argument at trial was that Schilling deceived Stryker in misreporting remuneration payments he was receiving from ORP. But the district court didn't buy this theory. The evidence showed that Schilling owned a half stake in ORP when Stryker hired him in 2006. He then divested his shares after accepting his new job at Stryker, at Stryker's request, to be paid out by ORP over time. ORP gave Schilling the option to buy back his shares between 2006 and 2013 at 25% interest, but Schilling never exercised the option. Nevertheless, Stryker alleged in the district court, and now on appeal, that Schilling had an outsized interest in ORP's success to secure his financial stake.

Like the district court, we disagree that the evidence supports this allegation. Also, Schilling did not testify at trial, so for that and the other reasons stated here we do not weigh in on Stryker's claims related to Schilling.

court legally erred in (1) determining that ORP's alleged breaches of the SRAs were immaterial, and thus insufficient to breach the contracts under New Jersey law; (2) accepting ORP's "pretext theory" that Stryker acquiesced to ORP's alleged misconduct and therefore waived its right to enforce the SRAs, despite the agreements' non-waiver provision; and (3) relying on expert opinion testimony "disguised" as lay opinion. Op. Br. at 13.

### A.    Standard of Review

On the first two issues, materiality and waiver, Stryker shoehorns fact-based issues into legal arguments, presumably to avail itself of de novo review. But when the factual inquiries predominate in a mixed question of law and fact, as they do here, our review is for clear error. *See United States v. Abouselman*, 976 F.3d 1146, 1153–54 (10th Cir. 2020). On the third issue, lay opinion, we review a trial court's decision to admit evidence as expert or lay opinion for abuse of discretion. *See Ryan Dev. Co., L.C. v. Indiana Lumbermens Mut. Ins. Co.*, 711 F.3d 1165, 1170 (10th Cir. 2013).

### B.    Materiality

As a matter of law, Stryker argues that the district court erred in assuming that Stryker's nonperformance could be excused only by a "material breach." Op. Br. at 21. Stryker notes that the contract language simply required a "breach," and therefore the district court wrongly ignored the "*cumulative* impact" of the numerous "immaterial" breaches ORP committed. *Id.* at 16, 20–22. Stryker argues that the district court erred because it "sliced and diced"

23

ORP's misconduct instead of viewing it as an "organic whole." *Id.* at 17, 41. In particular, Stryker contests the district court's determinations that three instances were immaterial: "ORP's late invoices, Stapleford's suspension, and SegWay sales." Stryker Reply Br. at 4.

As to the invoices, Stryker decries the district court's finding based on "legally extraneous considerations" and urges that ORP's "failure to timely submit 24 invoices" violated ORP's covenant to comply with Stryker policies. Op. Br. at 34–36. Regarding the SegWay sales, Stryker challenges the district court's finding that ORP's sales were immaterial and insists that $150,000 "is a material amount." Stryker Reply Br. at 19. And as for Stapleford's suspension, Stryker contends that this "indisputably breached the SRA" because it violated JSRA Sections 6.1 (goodwill), 7.3 (compliance with rules and policies), and 13.11 (compliance with applicable laws). Op. Br. at 20. Stryker alleges that ORP's breaches under these provisions were material as a matter of law.

To buttress this proposition, Stryker cites a Third Circuit opinion saying that if a breach of a contractual provision "excuses the future performance" by the nonbreaching party, then "[b]y contractual definition . . . such obligations are material."[9] Stryker Reply Br. at 2 (quoting *In re Gen. DataComm Indus.,*

_____

[9] Stryker claims that New Jersey courts have applied this principle, citing as an example *Dunkin' Donuts of Am., Inc. v. Middletown Donut Corp.*, 495 A.2d 66 (N.J. 1985). But materiality was not at issue in *Dunkin' Donuts*, and so we find that case irrelevant to this analysis.

24

*Inc.*, 407 F.3d 616, 623 n.12, 624 (3d Cir. 2005)). But in *DataComm*, the Third

Circuit also recognized that "what constitutes a material breach . . . is governed

by relevant state law." 407 F.3d at 623 (citing *In re Columbia Gas Sys. Inc.*, 50

F.3d 233, 240 n.10 (3d Cir. 1995)).[10] And in New Jersey, materiality is a

question for the trier of fact. *See Magnet Res., Inc. v. Summit MRI, Inc.*, 723

A.2d 976, 982 (N.J. Super. Ct. App. Div. 1998).

The district court found ORP's conduct immaterial, which is a

fact-finding that we cannot reverse on appeal without a showing of clear error.

*See Ryan*, 557 F.3d at 1157. Seeing none, we decline to disturb the district

court's rulings as to materiality.

### C.    Waiver

Stryker next argues that the district court's failure to enforce the

non-waiver provision under Section 22 of the SRAs was legal error.

Section 22 states:

> The failure at any time of either Party to enforce any provision(s) of
> this Agreement shall not constitute or be construed as a waiver of
> the provision(s) or of the right of that Party to subsequently enforce
> that, or any other provision(s), of this Agreement.

App. vol. 7, at 1488, 1513.

---

[10] Our circuit adopts the same principle that materiality is a state law issue. *See, e.g.*, *Elm Ridge Expl. Co., LLC v. Engle*, 721 F.3d 1199, 1212 (10th Cir. 2013) (applying New Mexico law); *Elec. Distribs., Inc. v. SFR, Inc.*, 166 F.3d 1074, 1086 (10th Cir. 1999) (applying Colorado law).

The district court made several findings on waiver. First, the court found that Stapleford's suspension—one of Stryker's purported "cause[s]" for terminating the JSRA—was both "immaterial" and waived because "Stryker [had] known about Mr. Stapleford's suspension for months without objecting." *ORP Surgical*, 2022 WL 4298189, at *5. More pointedly, the court perceived that Stryker's citing the suspension was merely a "post-hoc legal justification[]" for its litigation with ORP. *Id.* Second, the district court dismissed Stryker's reference to Stapleford's "insubordination" as a breach of the JSRA. *Id.* The court acknowledged that Petrides and Stapleford were "abrasive and difficult to work with," while noting that "Stryker did not mention insubordination as a cause for termination until litigation began." *Id.* Third, the court was unmoved by Stryker's contention that ORP's SegWay sales breached the TSRA. Regarding the SegWay sales, the court observed that "Stryker never provided ORP training or inventory" for its own product, despite ORP's requests to that effect, and that Stryker had thus "tacit[ly] consent[ed]" to the sales of a competitor product. *Id.* at *6.

On appeal, Stryker casts these findings as legal and factual error. To the extent that Stryker delayed enforcing the JSRA against ORP after Stapleford's suspension in November 2018, which Stryker denies, Stryker maintains that the non-waiver provision preserved its right to enforce the JSRA against ORP in March 2019. And to the extent that Stryker allowed ORP to sell SegWay products through "knowledge and tacit consent," which it also denies, Stryker

alleges that the non-waiver provision kicked in to save that claim as well. Op. Br. at 42. Stryker recognizes that the SRAs contemplate waiver but clarifies that the contracts do so "only by a written instrument signed by [Stryker and ORP]." Stryker Reply Br. at 6 (quoting App. vol. 7, at 1488). And as Stryker points out, no such agreement was signed here.

Under New Jersey law, "[t]he intent to waive need not be stated expressly, provided the circumstances clearly show that the party knew of the right and then abandoned it, either by design *or indifference*." *Knorr v. Smeal*, 836 A.2d 794, 798 (N.J. 2003) (emphasis added); *accord Merchs. Indem. Corp. of N.Y. v. Eggleston*, 172 A.2d 206, 216 (N.J. Super. Ct. App. Div. 1961), *aff'd*, 179 A.2d 505 (N.J. 1962) (stating that waiver may arise from "continu[ed] indifference to the exercise of [a] right" despite "full knowledge of circumstances producing [that] right"). As with any contract provision, "the nonwaiver provision itself . . . is subject to waiver by agreement or conduct during performance." 13 *Williston on Contracts*, § 39:36 (4th ed.); *see also Gray Holdco, Inc. v. Cassady*, 654 F.3d 444, 454 (3d Cir. 2011) (concluding that a party who pursues "extensive litigation inconsistent" with their contractual right to arbitrate could, indeed, waive the right to arbitration through that litigious conduct).

Also, in New Jersey, waiver of a contract provision through a party's actions—or inactions—is a question of fact, not law. *See Shebar v. Sanyo Bus. Sys. Corp.*, 544 A.2d 377, 384 (N.J. 1988) ("Questions of waiver . . . are

27

usually questions of intent, which are factual determinations . . . ."); *lafelice ex rel. Wright v. Arpino*, 726 A.2d 275, 278 (N.J. Super. Ct. App. Div. 1999) (clarifying that "if a fact-finder could reasonably draw either inference," that is an inference of "recission or affirmation" of a contract based on a party's conduct after a breach, then "the issue is one of fact"); *Garden State Bldgs., L.P. v. First Fid. Bank, N.A.*, 702 A.2d 1315, 1322–23 (N.J. Super. Ct. App. Div. 1997) (providing that waiver may occur by "passive conduct," and that "[s]uch waiver is basically a question of intention, and usually a matter for the trier of fact").

The district court made a specific fact-finding that Stryker's stated reasons for terminating the JSRA were simply "post-hoc legal justifications." *ORP Surgical*, 2022 WL 4298189, at *5. It also found that the SegWay sales did not cause ORP to breach its obligations under the TSRA, nor did the sales provide grounds to relieve Stryker from paying the restriction payments.

Accepting these findings as true and applying the governing law, we perceive no legal error here. New Jersey law allows non-waiver provisions to be waived the same as any other contract provision. *See Cnty. of Camden v. FCR Camden, LLC*, No. A-2324-19, 2021 WL 2879119, at *13 (N.J. Super. Ct. App. Div. July 9, 2021) (citing 13 *Williston on Contracts*, § 39:36). And so we consider whether one of the contracted parties, through its conduct or indifference, elected "to forego some advantage which that party might have demanded and insisted on" under the contract. *Indagro v. Nilva*, No. 07-CV-

3742, 2016 WL 3574330, at *5 (D.N.J. June 30, 2016) (quoting *West Jersey*

*Title & Guar. Co. v. Indus. Tr. Co.*, 141 A.2d 782, 786 (N.J. 1958)). Here, the

district court found that Stryker was indifferent, which defeats its waiver

argument as a matter of law.

### D.    Lay Opinion

At trial, Stryker objected to the admission of testimony from one of

ORP's witnesses, Dr. Tuttle, on the ground that the testimony was undisclosed

expert opinion. ORP countered that Dr. Tuttle was simply testifying to "what he

does for a living" and maintained that the court could hear his testimony as a

lay witness. App. vol. 30, at 5781. The district court denied Stryker's objection

and admitted the testimony as lay opinion. Stryker reprises its objection on

appeal, contending that the district court legally erred in admitting the

testimony as improper expert opinion "disguised" as lay opinion. Op. Br. at 29.

The Federal Rules of Evidence cover lay-witness testimony in Rule 701:

> If a witness is not testifying as an expert, testimony in the form of
> an opinion is limited to one that is: (a) rationally based on the
> witness's perception; (b) helpful to clearly understanding the
> witness's testimony or to determining a fact in issue; and (c) not
> based on scientific, technical, or other specialized knowledge within
> the scope of Rule 702.

Testimony that reflects "technical or specialized knowledge" generally

falls outside the ambit of Rule 701. *See James River Ins. Co. v. Rapid Funding,*

*LLC*, 658 F.3d 1207, 1215 (10th Cir. 2011) ("Knowledge derived from previous

professional experience falls squarely within the scope of Rule 702 and thus by

29

definition outside of Rule 701." (cleaned up)). But possessing expert knowledge or training does not automatically disqualify someone as a lay witness. *See Ryan Dev. Co.*, 711 F.3d at 1170–71 (citing *First Annapolis Bancorp, Inc. v. United States*, 72 Fed. Cl. 204, 207 (Fed. Cl. 2006); *Teen-Ed, Inc. v. Kimball Int'l, Inc.*, 620 F.2d 399, 402–04 (3d Cir. 1980)). Witnesses with professional expertise may qualify as lay witnesses if their testimony pertains to personal experience or first-hand knowledge. *See, e.g.*, *Ryan Dev. Co.*, 711 F.3d at 1170–71 (concluding that an accountant's testimony was lay opinion because he used basic arithmetic and personal experience to calculate lost income and other claims); *Weese v. Schukman*, 98 F.3d 542, 550 (10th Cir. 1996) (upholding the district court's admission of a physician's testimony as lay opinion where the testimony was helpful and drew from his general experience as a physician).

Dr. Tuttle testified that he did not consider Stryker's hip stem and Link's hip stem to be competing products. He expressed this opinion based on his experience as an orthopedic surgeon. He recounted one incident when using Stryker's product "basically ruined [a] patient's life for a year" because the hip stem caused a fracture that became infected. App. vol. 30, at 5782. Dr. Tuttle also explained that, though he prefers Link's hip stem, he knows other surgeons who prefer different products.

Dr. Tuttle's testimony is a close call. But we cannot say that the district court abused its discretion, especially given the "greater leeway" we give the

court to make evidentiary rulings in a bench trial. *Att'y Gen. of Okla. v. Tyson Foods, Inc.*, 565 F.3d 769, 780 (10th Cir. 2009); *cf. Tosco Corp. v. Koch Indus. Inc.*, 216 F.3d 886, 896 (10th Cir. 2000) ("[I]n bench trials questions raised relative to the admission or exclusion of evidence become relatively unimportant, because the rules of evidence are intended primarily for the purpose of withdrawing from the jury matter which might improperly sway the verdict." (cleaned up)).

Dr. Tuttle's opinion that the Stryker and Link hip stems were not competitive was rationally based on his perception that Stryker's product harmed patients in certain scenarios. *See* Fed. R. Evid. 701(a). Dr. Tuttle testified that some surgeries may require different hip stems based on the patient's needs and that surgeons may hold preferences between ostensibly similar devices, which helped the court determine that Stryker's and Link's hip stems were not interchangeable and thus not competitive. *See* Fed. R. Evid. 701(b). And Dr. Tuttle's opinion did not rely on a technical understanding of each device's mechanics, but rather reflected his personal frustrations with Stryker's product. *See* Fed. R. Evid. 701(c). So, as with the accountant's testimony in *Ryan Dev. Co.*, Dr. Tuttle's testimony pulled from basic observations about patients' individual needs and his personal experiences in the operating room. *See* 711 F.3d at 1170; *see also James River*, 658 F.3d at 1214 (noting that lay opinion covers common observations).

31

Stryker also mischaracterizes the district court's ruling in stating that the court relied "exclusively" on Dr. Tuttle's testimony. Op. Br. at 29. In fact, the district court also considered Curtis's opinion that Link hip stems were competitive, but simply elected to credit the doctor's experience over "the businessman's opinion of hip-stem interchangeability." *ORP Surgical*, 2022 WL 4298189, at *4. Further, Curtis testified that Stryker had an interest in securing optimal patient outcomes and that "it's the surgeon's choice on what they feel comfortable putting in th[e] patient." App. vol. 32, at 6135. Viewed this way, Curtis's testimony actually supports the conclusion that ORP's occasional sale of Link hip stems abided by its agreement with Stryker, which under Section 6.4 granted ORP the "unfettered right to . . . distribute . . . products that are not competitive with any of the Products *or that do not conflict with the best interests of* [Stryker]." App. vol. 7, at 1477 (emphasis added).

Thus, the district court did not abuse its discretion in admitting Dr. Tuttle's testimony as lay opinion and relying on that opinion, in part, to conclude that the Link hip stem was not a competitive product.

Having reviewed all of Stryker's factual and legal issues on appeal related to the breach-of-contract claims and all counterclaims, we conclude that the district court did not err. We affirm all findings of fact and conclusions of law dispensed in the district court's order and judgment resolving ORP's breach-of-contract claims. We also affirm the portion of the order and judgment

32

requiring Stryker to pay ORP the restriction payments in the amount assessed by the district court.

We now turn to the matter of indemnification and the award of attorneys' fees.

## III.    Attorneys' Fees

Our task in this appeal is to determine whether the district court erred in construing the SRAs' indemnification provision, Section 18, as requiring Stryker to indemnify ORP for the attorneys' fees that ORP accrued in litigating against Stryker. Stryker argues that the court so erred. And due to its erroneous interpretation, Stryker contends, the district court mistakenly awarded attorneys' fees to ORP. For the reasons below, we agree with Stryker. We reverse the district court's ruling on the meaning of Section 18 as a matter of law and vacate the award of attorneys' fees.

### A.    Standard of Review

"The proper construction of a contract is a question of law we review *de novo.*" *Penncro Assocs., Inc. v. Sprint Spectrum, L.P.*, 499 F.3d 1151, 1155 (10th Cir. 2007). Under New Jersey law, which the parties agree controls, "[i]ndemnity contracts are interpreted in accordance with the rules governing the construction of contracts generally." *Ramos v. Browning Ferris Indus.*, 510 A.2d 1152, 1159 (N.J. 1986). These rules dictate that we "enforce the contracts which the parties themselves have made," lending all terms their plain and ordinary meaning. *Kampf v. Franklin Life Ins. Co.*, 161 A.2d 717, 720 (N.J.

1960) (citation omitted); *see M.J. Paquet, Inc. v. N.J. Dep't of Transp.*, 794 A.2d 141, 152 (N.J. 2002).

**B.    Section 18**

The precise contractual language is paramount to our analysis; and so, unexpurgated, Section 18 begins:

> Each Party shall indemnify, defend, exonerate, and hold the other harmless from and against the other for any and all claims, suits, liability, loss, costs, expenses (including, without limitation, reasonable attorneys' fees and expenses) or damages of any kind or nature howsoever caused by reason of any injury (whether to body, property, or personal or business character or reputation) sustained by any person or entity or to property by reason of or arising out of or relating to any breach of this Agreement by the indemnifying Party or any act, neglect, default, or omission by the indemnifying Party or by any of its or his agents, employees or other representatives (for the avoidance of doubt, in the case of Stryker Orthopaedics as the indemnifying Party, excluding any act, neglect, default or omission by Representative, any of his affiliates and any of their respective agents, employees or other representatives (including without limitation, the Representative Parties)).

App. vol. 7, at 1487–88, 1512.

Then it continues:

> The indemnified Party shall provide prompt written notice to the indemnifying Party of any such suits or claims, <u>provided</u> that the indemnified Party's delay in providing such notice to the indemnifying Party shall not discharge the indemnifying Party from the indemnification obligations hereunder, except to the extent such delay actually prejudices the indemnifying Party. The indemnifying Party shall undertake and conduct the defense of any such suit and shall keep the indemnified Party apprised of the progress of such suit. The indemnified Party shall be entitled to participate in such suit at its or his own expense, <u>provided</u>, <u>however</u>, if the indemnifying Party fails to defend such suit in a timely manner, the indemnified Party may defend such suit at the indemnifying Party's expense. The indemnifying Party shall not be entitled to settle, compromise or

34

otherwise dispose of any such suit or claim without the prior written consent of the indemnified Party, with the exception of settlements solely for monetary damages to be paid by the indemnifying Party.

*Id.*

The district court found the plain language of this provision to be "self-contradictory." App. vol. 5, at 1057. Looking to the parties' dueling interpretations of the language, the court decided that ORP's reading carried the day. The court agreed with ORP that the "express language . . . provides attorney's fees for costs arising out of Stryker's breach," despite other language in the provision that suggests pure application to third parties (i.e., the notice provision). *Id.* at 1058.

Much of the debate before the district court centered on the question of whether first-party indemnification claims—that is, a claim between the contracted parties—are cognizable under New Jersey law at all. Stryker and ORP marshaled competing caselaw to convince the district court of their respective positions.[11] But New Jersey caselaw on first-party indemnity is

---

[11] In the district court and on appeal, Stryker's argument that New Jersey law forbids first-party indemnification under Section 18 rests primarily on its interpretation of *Travelers Indemnity Co. v. Dammann & Co., Inc.*, a Third Circuit case interpreting New Jersey contract law. 594 F.3d 238 (3d Cir. 2010). Specific to the contract provision before the Third Circuit, the court held that the language could not sustain first-party indemnification because if it did the words "indemnify," "defend," and "hold harmless," would be rendered meaningless. *Id.* at 255. For the same reason, Stryker argues that Section 18 cannot be read to encompass ORP's claim for indemnity.

ORP counters with another case, *CEM Business Solutions, Inc. v. BHI Energy*, No. 21-CV-18543, 2022 WL 1017098, at *2–3 (D.N.J. Apr. 4, 2022),

(*footnote continued*)

35

something of a morass because the New Jersey Supreme Court has yet to rule on the issue. *See Boyle v. Huff*, Nos. A-1965-21, A-2046-21, 2023 WL 324796, at *6 (N.J. Super. Ct. App. Div. Jan. 20, 2023) ("Neither the New Jersey Supreme Court nor this court has ever held that indemnification provisions will not apply to first-party claims."). In this void of authority, what remains is a hodgepodge of opinions from several courts, offering reasonings and conclusions as varied as the contracts they interpret.[12] But we needn't weigh in on whether New Jersey law generally covers first-party indemnity claims because we hold that the provision before us does not.[13]

According to New Jersey law, we construe an indemnity provision for its plain and ordinary meaning, the same as we would any other contractual

where the court stated that indemnification provisions under New Jersey law may, and in that case did, apply to first-party suits.

[12] *Compare Atl. City Assocs., LLC v. Carter & Burgess Consultants, Inc.*, 453 F. App'x 174, 180 (3d Cir. 2011) (applying New Jersey law), *and Invs. Sav. Bank v. Waldo Jersey City, LLC*, 12 A.3d 264, 270–71 (N.J. Super. Ct. App. Div. 2011) (opposing first-party indemnity claims), *with Boyle*, 2023 WL 324796, at *6, *and CEM Bus. Sols., Inc.*, 2022 WL 1017098, at *3 (supporting first-party indemnity claims).

[13] In *Dammann*, the Third Circuit commented that, though "no New Jersey case . . . actually permits an indemnitee to maintain the [first-party indemnification] claim that [the appellant] wishes to assert against [the appellee]," the court could not "hold that first-party indemnification claims . . . are categorically barred as a matter of law in New Jersey absent direct authority to that effect." 594 F.3d at 255. We recognize that the Third Circuit deliberately cabined its holding in *Dammann* to leave the door open for future first-party indemnity claims presented under a different set of facts. *See id.* (declining to implement "a sweeping rule" on first-party indemnification under New Jersey law). With that said, we needn't opine on the matter further.

provision. *See Kieffer v. Best Buy*, 14 A.3d 737, 742–43 (N.J. 2011). We take the language as we find it, not as we wish it were. *See Kampf*, 161 A.2d at 720; *see also* Antonin Scalia & Bryan Garner, *Reading Law: The Interpretation of Legal Texts* 174 (2012) (divining that "it is no more the court's function to revise by subtraction than by addition"). And given the murky, distended language laid before us in Section 18, we wade through it cautiously, word by word.

Holding a microscope up to Section 18, we begin with the designation, "Each Party," which everyone seems to agree contemplates the possibility of either contracted party as the indemnitor. App. vol. 7, at 1487, 1512. The language then goes on to say that the indemnitor "shall indemnify . . . and hold *the other* harmless." *Id.* (emphasis added). In this context, "the other" naturally refers to the party positioned opposite the indemnitor: the indemnitee. And so Section 18 reads, "[The indemnitor] shall indemnify . . . and hold [the indemnitee] harmless . . . ." *Id.* So far so good; Section 18 reads like a standard indemnification provision. We continue: "[The indemnitor] shall indemnify . . . and hold [the indemnitee] . . . harmless from and against *the other*." *Id.* (emphasis added). The second appearance of "the other" is confounding. Nevertheless, we can infer that this second "the other" must revert back to the indemnitor. For we know that this time "the other" can't be the indemnitee— the indemnitee was just mentioned—therefore "the other" must be some person *other* than the indemnitee. But we also know that "the other" can't be a third

party because "the other" (notably, not "another") inheres a limited universe containing only two alternatives—or perhaps two opposing parties. Thus, here, "the other" must be the indemnitor. With that understanding, Section 18 now reads, "[The indemnitor] shall indemnify . . . and hold [the indemnitee] . . . harmless from and against [the indemnitor] for any and all claims . . . ." *Id.*

In this appeal, Stryker is the purported indemnitor and ORP is the purported indemnitee. So plugging Stryker and ORP into their assigned roles inside our newly elucidated version of Section 18, we can comfortably read the provision to say that "[Stryker] shall indemnify, defend, exonerate, and hold [ORP] harmless from and against [Stryker] for any and all claims . . . (including, without limitation, reasonable attorneys' fees and expenses) . . . ." *Id.* Under this refreshed reading, we agree with the district court that the outset of Section 18 appears to encompass, and even to limit, indemnification to first-party claims. *Id.*

But the first line of Section 18 is not the end of the story; and as we continue reading, our construction of the language diverges from the district court's. After the first line, Section 18 proceeds to list the indemnifiable claims available under the provision, including "any and all claims, suits, liability, loss, costs, expenses (including, without limitation, reasonable attorneys' fees and expenses) or damages of any kind or nature howsoever caused *by reason of any injury* (whether to body, property, or personal or business character or reputation) sustained by any person or entity . . . by reason of . . . any breach of

38

this Agreement." *Id.* (emphasis added). Two things strike us about this language.

First, instead of calling the injured party, "the indemnified party"—the label used throughout the rest of Section 18—the provision describes the injured as "any person or entity." Had the parties intended Section 18 to encompass first-party indemnity, we would expect the language to clarify that the indemnitee is (or at least can be) the one injured. In omitting "the indemnified party" from the list of the potentially injured persons, Section 18 begins to lean away from first-party indemnification.

Second, the language states that any indemnifiable claim must be precipitated by an injury as defined by the parenthetical. That is, the obligation to indemnify under Section 18 is triggered only when the "person or entity" sustains an injury "to body, property, or personal or business character or reputation." *Id.*

This exhaustive list of potential injuries presents the first major hurdle for ORP. ORP argues initially that Stryker caused an injury that satisfies Section 18 because the language employs the broadening term "any" and New Jersey law recognizes breach of contract as legal injury per se. But these arguments ignore the enumerated list of injuries recognized by Section 18. The provision limits the class of injuries sufficient to trigger an indemnifiable claim as those to "body, property, or personal or business character or reputation." *Id.* Though it may be possible for ORP to have sustained one of these injuries

under a different set of facts, it's not clear that ORP sustained such an injury here. The only realistic contender that we can perceive is an injury to ORP's property caused by Stryker's failure to fulfill ORP's contractual right to receive the restriction payments. But even so, it's not at all obvious that Stryker's refusal to pay the restriction payments injured ORP's "property." ORP carries the burden to show its entitlement to recover attorneys' fees under Section 18 and, based on the limited list under Section 18, we conclude that it has failed to do so. *See Green v. Morgan Props.*, 73 A.3d 478, 492 (N.J. 2013).

The next hurdle for ORP is that the rest of Section 18 overwhelmingly suggests third-party indemnification. New Jersey law requires that we construe contract provisions "as a whole." *Dammann*, 594 F.3d at 255 (quoting *Hardy ex rel. Dowdell v. Abdul-Matin*, 965 A.2d 1165, 1169 (N.J. 2009)). Doing so here, we deduce that the remaining clauses in Section 18, or the "ancillary clauses" as Stryker calls them, signal third-party indemnification. Op. Br. at 54.

To start, every ancillary clause addresses the indemnified party's rights in "such suits," meaning the "suits" defined earlier in Section 18. The word "such" reveals that Section 18 contemplates only one type of suit. And the substance of the ancillary clauses firmly suggests suits brought by third parties. The ancillary clauses provide for notice of suit to the indemnitee, progress updates of the suit to the indemnitee, the indemnitee's right to participate in the suit at its own expense, and the indemnitee's entitlement to give written consent prior to settlement. Clauses of this sort only make sense in a third-party

40

context, and other courts have routinely associated these types of clauses with third-party rights. *See, e.g.*, *Pfizer, Inc. v. Stryker Corp.*, 348 F. Supp. 2d 131, 146 (S.D.N.Y. 2004) (portraying the indemnitee's right to notice, right to conduct and control over claims, and right to employ counsel as "rights and obligations for indemnification for third party claims"); *Oscar Gruss & Son, Inc. v. Hollander*, 337 F.3d 186, 199–200 (2d Cir. 2003) ("A finding that the indemnification clause did not reach suits between the parties was also supported 'by other provisions in the contract which unmistakably relate to third-party claims.'" (quoting *Hooper Assocs., Ltd. v. AGS Computs., Inc.*, 548 N.E.2d 903, 905 (N.Y. 1989))). So reading the provision as a whole, it appears that the parties intended to limit their indemnity obligations to claims raised by third parties. *See George M Brewster & Son v. Catalytic Constr. Co.*, 109 A.2d 805, 812 (N.J. 1954) (interpreting the terms of an indemnity provision "as a whole" to divine "the common understanding" of the parties); *see also Millville Sav. Bank v. Malvern Bank, Nat'l Ass'n*, No. 21-CV-13001, 2022 WL 279833, at *4 (D.N.J. Jan. 31, 2022) (applying Pennsylvania law) ("While the paragraph that Plaintiff cites is tremendously broad, the Court agrees with Defendant that, when read in context, it implicitly applies only to third-party indemnification."); *NAR Bus. Park, LLC v. Ozark Auto. Distribs., LLC*, 430 F. Supp. 3d 443, 461 (N.D. Ill. 2019) ("A contract may *implicitly* limit indemnification to third parties, however, if it contains language inconsistent with first-party indemnification.").

41

So after trudging through Section 18, we are left with introductory language suggesting that an odd first-party indemnity coverage is in play, but also with ancillary clauses talismanic of third-party indemnification. When faced with at least two reasonable yet opposing interpretations of a contract, New Jersey law instructs that we find the language ambiguous. *See M.J. Paquet Inc.*, 794 A.2d at 152 ("An ambiguity in a contract exists if the terms of the contract are susceptible to at least two reasonable alternative interpretations." (cleaned up)). So we find Section 18 ambiguous and interpret the ambiguity according to typical canons of contract construction.[14] *Kieffer*, 14 A.3d at 742–43 ("The objective in construing a contractual indemnity provision is the same as in construing any other part of a contract . . . .").

Turning to the canons, in New Jersey, courts must construe ambiguous indemnification provisions against the indemnitee. *Id.* at 743; *Litton Indus., Inc. v. IMO Indus., Inc.*, 982 A.2d 420, 427–28 (N.J. 2009). With this preference in mind, we are compelled to construe the provision against indemnification, and therefore against ORP. On that basis, we vacate the award of reasonable attorneys' fees granted to ORP. Because ORP cannot recover any

---

[14] All the typical canons apply, except that, contrary to New Jersey's convention to construe ambiguity against the drafter, *Roach v. BM Motoring, LLC*, 155 A.3d 985, 991 (N.J. 2017), we will not automatically construe the ambiguity against Stryker because of the SRAs' Section 28: "The Parties acknowledge that this Agreement is the result of negotiations so neither Party shall avail itself of any rule of construction that would resolve ambiguities against a drafting party." App. vol. 7, at 1489, 1514.

fees under Section 18, Stryker's remaining challenges to specific categories of ORP's fees are moot.

Yet we acknowledge the district court's caveat that if the SRAs had not required Stryker to pay ORP attorneys' fees, then the court "would likely have ordered defendant to reimburse plaintiffs for the attorney's fees and costs plaintiff incurred during the discovery process." *ORP Surgical*, 2022 WL 4298189, at *14. Owing deference to the district court's "inherent powers" to manage discovery, we remand this case to the district court to determine and order sanctions if the court sees fit. *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 45–46 (1991) (reviewing the circumstances in which "federal courts have inherent power to assess attorney's fees against counsel," including "when a party has acted in bad faith," specifically "by delaying or disrupting the litigation" (cleaned up)).

## IV.    ORP's Cross-Appeal

On cross-appeal, ORP raises a single claim: the district court erred in awarding nominal damages for Stryker's breach of the non-solicitation/non-diversion provision. We affirm the district court.

### A.    Standard of Review

The party seeking damages bears the burden of proof. *Caldwell v. Haynes*, 643 A.2d 564, 571 (N.J. 1994). We give "considerable deference" to the damages assessed by the trier of fact, especially when damages are uncertain. *Maul v. Kirkman*, 637 A.2d 928, 939 (N.J. Super. Ct. App. Div.

43

1994) (citing *Baxter v. Fairmont Food Co.*, 379 A.2d 225, 229–230 (N.J. 1977)).

## B.   Nominal Damages

The district court found that Stryker solicited and diverted ORP reps in breach of the TSRA. But shifting gears from liability to damages, the court struggled to measure the damages owed to ORP from Stryker's breach. The assessment of damages was the sticking point for the district court and is the source of ORP's cross-appeal.

At trial, the district court asked ORP to articulate the "economic consequence" of Stryker's solicitation and diversion. App. vol. 33, at 6570. ORP's expert had offered a couple of theories, and Stryker's expert took a stab as well. But ultimately, the court felt that "[n]either party provided anything useful," and discerned nothing from the record from which it could measure the damages ORP incurred from Stryker's solicitation and diversion. *ORP Surgical*, 2022 WL 4298189, at *10.

Principally, the court found "insufficient evidence" that Stryker's tactics actually *caused* ORP's reps to resign and accept positions at Stryker. *Id.* at *11. In reaching this determination, the court recognized that Petrides's termination of the TSRA deprived the reps of most of their income opportunities. The court noted that much of the reps' training and expertise was particular to Stryker's products, which the reps could no longer sell. So naturally, the court concluded, those reps sought positions in-house with Stryker after the TSRA terminated.

44

The court's finding that Stryker's actions were not the but-for cause of the ORP reps jumping ship stymied its ability to measure compensatory damages. Compensatory damages contemplate the position the nonbreaching party would have been in but for the breach, but here the court determined that the reps would have left even without Stryker's breach. So the court concluded that compensatory damages were inapt to remedy ORP's injury. And even if compensatory damages had been on the table, the court wasn't convinced by any of ORP's damages proposals. Finding that ORP failed to carry its burden in proving damages, the court instead awarded nominal damages, which is the prescribed alternate remedy under New Jersey law. *See Salt Lake Trib. Publ'g Co., LLC v. Mgmt. Plan., Inc.*, 454 F.3d 1128, 1141 (10th Cir. 2006) ("Whenever there is a breach of contract, the law ordinarily infers that damages ensued, and, in the absence of actual damages, the law vindicates the right by awarding nominal damages." (cleaned up)).

ORP challenges the district court's nominal damages award and argues for compensatory damages. But from the jump, Stryker asserts that ORP waived this argument by neglecting to preserve it in its Rule 59(e) post-judgment motion.

We pause to consider preservation and Rule 59(e).

Under Rule 59(e), a party may move the court "to alter or amend a judgment" within 28 days after the entry of judgment. Fed. R. Civ. P. 59(e). A Rule 59(e) motion "is appropriate where the court has misapprehended the

facts, a party's position, or the controlling law." *Servants of Paraclete v. Does*, 204 F.3d 1005, 1012 (10th Cir. 2000). When a party raises one of these challenges, the motion preserves that issue for appellate review. *AdvantEdge Bus. Grp. v. Thomas E. Mestmaker & Assocs., Inc.*, 552 F.3d 1233, 1238 (10th Cir. 2009); *cf. Elm Ridge Expl. Co., LLC v. Engle*, 721 F.3d 1199, 1219 (10th Cir. 2013) (deciding that a Rule 59(e) motion could preserve issues for appeal where the appellant neglected to renew its motion for judgment as a matter of law).

ORP's Rule 59(e) motion raised two issues for the district court to reconsider: (1) the sanctions order for Special Master's fees, and (2) damages for soliciting and diverting Demorset in breach of the JSRA. The first issue is not relevant to ORP's cross-appeal.

On the second issue, ORP attempted to distinguish Demorset's hiring from the other ORP reps Stryker hired. For the other reps, ORP acquiesced to the district court's reasoning that "only nominal damages should be awarded" because ORP lacked sufficient evidence to show Stryker caused those reps to leave. App. vol. 2, at 367. ORP parroted the court's judgment that ORP's terminating the TSRA "left the sales reps without the ability to continue to sell Stryker products," and thus that the reps' seeking jobs at Stryker was inevitable. *Id.* at 368 (citation omitted). ORP then used that segment of the district court's judgment as a springboard for its argument that Demorset's hiring was different; specifically, ORP alleged that "this reasoning does not

46

apply" to Demorset. *Id.* at 360. According to ORP, Demorset presented a different case because Stryker hired him in breach of the JSRA, which Stryker terminated. And so, ORP moved the court to reconsider awarding actual damages for Stryker's diverting Demorset, which flowed solely from Stryker's breach, unlike the other hirings that were caused at least partly by ORP's own actions.

Before us, ORP changes tack and contends that nominal damages were an inadequate remedy for Stryker's diversion of the other reps, without mentioning Demorset at all. This is not the argument ORP made in its Rule 59(e) motion. In the post-judgment motion, not only did ORP not challenge the nominal damages remedy, but it accepted the district court's reasoning—the same reasoning that ORP now claims to constitute legal error. This dissonance between ORP's 59(e) arguments and its appellate arguments supports Stryker's position that the nominal damages issue is not properly before us on appeal. *See Little v. Budd Co., Inc.*, 955 F.3d 816, 821 (10th Cir. 2020) (noting that arguments waived for appeal include "a new theory on appeal that falls under the same general category as an argument presented at trial" (citation omitted)).

"Our preservation rules are part of the 'winnowing process' of litigation that permits a court to 'narrow what remains to be decided.'" *United States v. Walker*, 918 F.3d 1134, 1151 (10th Cir. 2019) (quoting *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 487 n.6 (2008)). In doing so, we strongly disfavor parties' attempts to use this court as "a second-shot forum" for mounting theories

47

unexplored in the district court. *Fish v. Kobach*, 840 F.3d 710, 730 (10th Cir. 2016) (cleaned up). That said, we retain discretion to reach the merits of any unpreserved issue. *Johnson v. Spencer*, 950 F.3d 680, 707 (10th Cir. 2020).

Throughout the proceedings in district court, ORP advocated for compensatory damages in recovery for Stryker's solicitation and diversion of its sales reps. ORP offered multiple theories on how to calculate these damages, which the court heard and considered. *See Niemi v. Lasshofer*, 770 F.3d 1331, 1346 (10th Cir. 2014) ("It is a general rule that a federal appellate court will not consider an issue which was not presented to, considered or decided by the trial court." (citation omitted)). Stryker, too, had the opportunity to present its own evidence and countervailing calculations for ORP's loss, which weighs in favor of us hearing ORP's unpreserved damages claim. *See Lyons v. Jefferson Bank & Tr.*, 994 F.2d 716, 720 (10th Cir. 1993) (stressing that parties should have "the opportunity to offer all the evidence that they believe relevant to the issues" and "present whatever legal arguments [they] may have" before the issues proceed on appeal (citation omitted)). Further, we confine our analysis to the legal sufficiency of nominal damages as the remedy for ORP's injury, not the amount of damages as a matter of fact. *See Stahmann Farms, Inc. v. United States*, 624 F.2d 958, 961 (10th Cir. 1980) (recognizing that preservation principles are "relaxed somewhat where the question is one of law"). So even though ORP fumbled the ball under Rule 59(e), we address the legal merits of ORP's cross-appeal.

Moving to the merits, ORP alleges that (1) the district court erred in determining that Stryker's solicitations did not cause ORP's reps to leave; (2) the court misconstrued the contractual terms "divert," "hire," and "poach"; and (3) the court wrongly rejected two valid calculations for compensatory damages, which led to an inadequate remedy in the form of nominal damages. For the reasons stated above, we limit our analysis to the legal questions presented on cross-appeal. To that end, we review de novo ORP's claims under New Jersey law. *See Black & Veatch Corp. v. Aspen Ins. (Uk) Ltd.*, 882 F.3d 952, 957 (10th Cir. 2018).

At the outset, we accept as true the district court's finding that Stryker's solicitation and diversion tactics did not cause the ORP reps to resign and accept jobs at Stryker.[15] Relatedly, the court concluded that "Stryker did not breach the contract by *poaching* ORP reps, it broke the contract by *soliciting and diverting*" them. *ORP Surgical*, 2022 WL 4298189, at *10. ORP asserts that this constituted legal error because in distinguishing between "divert[ing]" and "poach[ing]" the court misapprehended the contractual language. Answer Br. at 74. And further, ORP accuses the district court of denying damages

---

[15] ORP casts its first argument on cross-appeal as a legal issue, when truly it challenges the district court's factual findings. As we've addressed already, ORP's preservation of the issues on cross-appeal is tenuous at best. What's more, in its Rule 59(e) motion, ORP accepted the district court's finding that Stryker's tactics were not the cause of ORP's sales reps leaving. So we decline to second guess the district court's findings on this point.

because they were "difficult to quantify," which ORP contends was likewise legal error.[16] *Id.* at 76.

Reviewing the disputed language with "fresh eyes," we don't perceive how the district court misconstrued the SRAs' language. *Kieffer*, 14 A.3d at 742. But more importantly, we struggle to see why it matters. ORP argues that in rejecting Stryker's poaching as the source of its damages, the court mistakenly disregarded the "economic impact" of Stryker hiring the ORP reps. Answer Br. at 75 (quoting App. vol. 5, at 1089). Put differently, ORP posits that had the district court correctly construed the meaning of "diverting," ORP would have received its desired damages award. That is not how we read the district court's decision.

---

[16] ORP relies on *Wolpaw v. General Accident Insurance Co.*, 639 A.2d 338 (N.J. Super. Ct. App. Div. 1994), in asserting that New Jersey law obligated the district court to "fashion a remedy" even when damages were uncertain. Resp. Br. at 76; ORP Reply Br. at 14. But *Wolpaw* is distinguishable. There, the court tolerated an inexact damages calculation because the uncertainty of the amount stemmed directly from the breach. *Wolpaw*, 639 A.2d at 341 ("[W]here the breach itself destroys the injured party's ability to prove damages with exactitude, the proof may be inexact."). The court observed that the plaintiff's damages could not "even be approximated" because, in that case, assessing damages would have required the plaintiff "to prove the outcome of a trial that never occurred." *Id.*

Unlike *Wolpaw*, Stryker's breach did not prevent ORP from calculating its damages. ORP did calculate damages, under three separate theories, two of which it reargues on appeal—one amount for $4.7 million and another for $907,000. The court simply rejected these theories due to various logical and factual flaws. Thus, the court didn't shun any obligation to fashion a remedy, ORP failed to meet its burden to prove damages by a preponderance of the evidence. *See Caldwell*, 643 A.2d at 571.

The court found it indisputable that Stryker solicited and diverted ORP employees and thus breached the contract. Having established liability, what mattered next was ORP's ability to state coherently the economic consequence of that breach. But on that score, ORP came up short. ORP's damages expert offered three alternative theories for awarding damages—fair market value, lost profits, and disgorgement—and the court rejected all of them. And more specifically as to each theory, the court found that the proposed amounts were either derived from flawed factual assumptions or otherwise unsupported by the evidence. So the court did not reject compensatory damages based on a divergent understanding of the words *diverting* or *poaching* or even based on the difficulty in calculating damages. Rather, the court declined to award compensatory damages because ORP failed to carry its burden in proving the economic consequence of Stryker's breach. And so, finding that its hands were tied, the court looked to governing New Jersey law and concluded that nominal damages provided an adequate substitute remedy.

This case comes to us from an especially complex, fact-bound bench trial. Particularly on damages, the court heard voluminous testimony from ORP's and Stryker's expert witnesses. We recognize that the trial judge occupied the prime seat to evaluate this evidence, along with its "'intangibles' . . . e.g., credibility, demeanor, feel of the case," from which to assess the damages amount—a factual question under New Jersey law. *Dombroski v. City of Atl. City*, 706 A.2d 242, 246 (N.J. Super. Ct. App. Div. 1998) (citations

omitted); *see Baxter*, 379 A.2d at 229–30. And the court's coming up empty on compensatory damages due to insufficient facts, is itself a fact-finding that we will not disturb on appeal. *See Baxter*, 379 A.2d at 230 (prescribing "corrective judicial action" on damages awarded by the trier of fact "only upon the predicate . . . that there has been a manifest miscarriage of justice"). The only remaining question for us is whether the district court erred when it concluded that nominal damages were an adequate substitute remedy for Stryker's breach of the non-solicitation/non-diversion provision.

In New Jersey, "[a]ctual damages . . . refers to the real losses flowing from" the breaching party's conduct. *W.J.A. v. D.A.*, 43 A.3d 1148, 1154 (N.J. 2012). Taking the district court's factual conclusions as we find them, we ascertain that ORP has failed to prove the real losses that flowed from Stryker's solicitation and diversion of the reps. Yet ORP indisputably suffered a breach, and so we infer that damages ensued. *See Nappe v. Anschelewitz, Barr, Ansell & Bonello*, 477 A.2d 1224, 1228 (N.J. 1984). When a nonbreaching party "has not proved a compensable loss," New Jersey law holds that "[n]ominal damages serve the purpose of vindicating" the party's legal rights. *Graphnet, Inc. v. Retarus, Inc.*, 269 A.3d 413, 422 (N.J. 2022) (cleaned up).

ORP alleges that the district court barred relief when it awarded nominal damages. But in New Jersey, nominal damages are a "legal remedy." *Id.* So ORP got relief, just not the relief it wanted. After reviewing ORP's claims on cross-appeal and canvassing the trial record, we discern no error—legal or

factual—committed by the district court. The award of nominal damages for Stryker's breach of the non-solicitation/non-diversion provision is affirmed.

## CONCLUSION

For the reasons stated, we affirm in part and reverse in part. The case is remanded for further proceedings in accordance with this opinion.