**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**March 3, 2025**

**Christopher M. Wolpert**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

MAGNETSAFETY.ORG; HOBBY
MANUFACTURERS ASSOCIATION;
NATIONAL RETAIL HOBBY STORES
ASSOCIATION, INC.,

     Petitioners,

v.

CONSUMER PRODUCT SAFETY
COMMISSION,

     Respondent.

------------------------------

CONSTITUTIONAL
ACCOUNTABILITY CENTER; PUBLIC
CITIZEN, INC.; ACADEMY OF
PEDIATRICS; NORTH AMERICAN
SOCIETY FOR PEDIATRIC
GASTROENTEROLOGY,
HEPATOLOGY, AND NUTRITION;
AMERICAN ACADEMY OF
OTOLARYNGOLOGY-HEAD AND
NECK SURGERY; AMERICAN
PEDIATRIC SURGICAL
ASSOCIATION; AMERICAN COLLEGE
OF SURGEONS,

     Amici Curiae.

No. 22-9578

_____

**Petition for Review from an Order of the Consumer Products Safety Commission**
**(CPSC No. CPSC 2021-0037)**

_____

Gregory Dolin, New Civil Liberties Alliance, Washington, D.C. (Kara M. Rollins of New Civil Liberties Alliance with him on the briefs), for Petitioners.

Adam C. Jed, U.S. Department of Justice, Civil Division, Washington, D.C. (Brian M. Boynton, Principal Deputy Assistant Attorney General and Daniel Tenny, Attorney, United States Department of Justice, Civil Division, with him on the briefs), for Respondent.

Elizabeth B. Wydra, Brianne J. Gorod, and Brian R. Frazelle, Constitutional Accountability Center, Washington, D.C., for Amicus Curiae Constitutional Accountability Center.

Adina H. Rosenbaum and Allison M. Zieve, Public Citizen Litigation Group, Washington, D.C., for Amicus Curiae Public Citizen, Inc.

Madeline Gitomer and William Bardwell, Democracy Forward Foundation, Washington, D.C., for Amici Curiae American Academy of Pediatrics; North American Society for Pediatric Gastroenterology, Hepatology, and Nutrition; American Academy of Otolaryngology-Head and Neck Surgery; American Pediatric Surgical Association; and American College of Surgeons.

_____

Before **MATHESON**, **MORITZ**, and **FEDERICO**, Circuit Judges.

_____

**MORITZ**, Circuit Judge.

_____

This appeal arises from the Consumer Product Safety Commission's second attempt to regulate small, high-powered magnets that can cause serious injury, and even death, when ingested by children. This court struck down the Commission's first attempt due to shortcomings in the data underlying its cost-benefit analysis. *See Zen Magnets, LLC v. Consumer Prod. Safety Comm'n*, 841 F.3d 1141 (10th Cir. 2016). The Commission went back to the drawing board and returned with the final rule that petitioner industry groups challenge here. Because the rule is supported by

substantial evidence and the structure of the Commission is constitutional, we deny the petition.

## Background

The small, powerful magnets at issue here come in various shapes, such as spheres, cubes, or cylinders, and can be assembled to create jewelry, sculptures, and puzzles. *See* Safety Standard for Magnets, 87 Fed. Reg. 57756 (Sept. 21, 2022) (to be codified at 12 C.F.R. §§ 1262.1—1262.5 ) [hereinafter Final Rule ]. Although seemingly innocuous, these consumer products carry a "unique, hidden hazard" that can have catastrophic consequences. *Id.* at 57772. When a child ingests two magnets, or one magnet and another magnetic object (called a "ferromagnetic object"), the attraction is so strong that they attempt to connect within the body, typically in the digestive tract.[1] *Id.* at 57758. The magnets can then clamp tissue, cutting off blood supply and resulting in necrosis in the intestines. *Id.* In other cases, the magnets rip through the tissue, releasing intestinal contents into the body, which can lead to sepsis. *Id.* at 57759. In one study of roughly 600 ingestions, more than half the children treated required hospitalization, and nearly 10% died. *Id.*

---

[1] Notably, many ingestions occurred "accidentally, while children and teens were attempting to separate the magnets with their teeth or were using the magnets to simulate oral piercings." Final Rule, 87 Fed. Reg. at 57772.



*Figure 1.* Examples of a magnet set executive desk toy (left), a decompression magnet pen toy (middle-left), rock magnet fidget toy (middle-right), and a magnetic jewelry set (right).

> Images of subject magnet products from the record. R. vol. 1, 237.

In response to these reported injuries, the Commission initiated a rulemaking process in 2012, seeking to regulate these magnets. The resulting rule limited the size and strength of magnets sold in a set. *See* Final Rule: Safety Standard for Magnet Sets, 79 Fed. Reg. 59962 (Oct. 3, 2014) [hereinafter 2014 Rule].[2] A divided panel of this court struck down that rule in 2016, concluding that the Commission failed to acknowledge "critical ambiguities and complexities in the data" it used to calculate the risk of injury and the public's need for the product. *Zen Magnets*, 841 F.3d at 1148. As to the risk of injury, the majority critiqued the Commission's failure to explain downward trends in injury rates that might show the rule was unnecessary, emphasizing "[a]n agency may not simply ignore without analysis important data trends reflected in the record." *Id.* at 1150–51. It also questioned the Commission's imprecision in calculating injury rates. *Id.* at 1151. Based on the keyword search used

---

[2] This rule defined "magnet sets" as "any aggregation of separable magnetic objects that is a consumer product intended, marketed[,] or commonly used as a manipulative or construction item for general entertainment, such as puzzle working, sculpture, mental stimulation, or stress relief." 2014 Rule, 79 Fed. Reg. at 59963.

to isolate injury reports, the Commission determined 90% of incidents only

"possibly" involved the covered magnet sets. *Id.* (quoting 2014 Rule, 79 Fed. Reg.

at 59978, 59980, 59985). The majority concluded that a "mere possibility" fell short

of the requirement that the rule be supported by substantial evidence. *Id.* at 1152.

Although the Commission maintained that its injury calculation was an undercount,

the majority nevertheless doubted the estimate's accuracy because "experts did not

quantify the degree to which they believe injuries [were] undercounted." *Id.* at 1152

n.14. Lastly, the majority found that the Commission failed to calculate the public's

need for the magnet sets as tools for scientific and mathematics education and

research. *Id.* at 1153.

  After the ruling in *Zen Magnets*, the Commission conducted further analysis

and returned with the final rule at issue in this case.[3] Final Rule, 87 Fed. Reg.

at 57756. Instead of just limiting the size and strength of magnets in sets, the rule

applies to all consumer magnet products that are "designed, marketed, or intended to

be used for entertainment, jewelry (including children's jewelry), mental stimulation,

[or] stress relief . . . and that contain[] one or more loose or separable magnets."

16 C.F.R. § 1262.2(b). The rule establishes new requirements for the small, powerful

---

  [3] The Commission additionally helped revise various voluntary safety standards, engaged in recalls and other compliance actions, conducted information campaigns, and considered an informational briefing package drafted by staff. *See* Safety Standard for Magnets, 87 Fed. Reg. 1260 (proposed Jan. 10, 2022) [hereinafter Proposed Rule].

magnets deemed hazardous: they must be too large to swallow or have a flux index[4]

of less than 50 kG$^2$ mm$^2$. *See* § 1262.2(a); Final Rule, 87 Fed. Reg. at 57778. Unlike

its predecessor, the final rule exempts magnets "sold and/or distributed solely to

school educators, researchers, professionals, and/or commercial or industrial users

exclusively for educational, research, professional, commercial, and/or industrial

purposes." § 1262.2(b). It also exempts children's toys already subject to a similar

safety standard. 16 C.F.R. § 1262.1(c).

After the Commission published the final rule, petitioners Magnetsafety.org,

the Hobby Manufacturers Association, and the National Retail Hobby Stores

Association, Inc. filed this petition for review, arguing the Commission erred in its

cost-benefit analysis under the Consumer Product Safety Act (CPSA), 15 U.S.C.

§ 2051–2090, and that the rule should be vacated because it was promulgated by an

unconstitutionally structured agency.

**Analysis**

We review consumer product safety rules in accordance with the

Administrative Procedures Act (APA), 5 U.S.C. § 701–706, to determine if they are

"supported by substantial evidence on the record taken as a whole." 15 U.S.C.

§ 2060(c); *see also Zen Magnets*, 841 F.3d at 1147. Substantial evidence is "such

relevant evidence as a reasonable mind might accept as adequate to support a

conclusion." *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019) (quoting *Consol. Edison*

---

[4] Flux index is a measure of a magnet's strength based on density and size. *See* Final Rule, 87 Fed. Reg. at 57765.

*Co. of N.Y., Inc. v. NLRB*, 305 U.S. 197, 229 (1938)). This "review is 'very deferential to the agency.'"[5] *Zen Magnets*, 841 F.3d at 1147 (quoting *Andalex Res., Inc. v. Mine Safety & Health Admin.*, 792 F.3d 1252, 1257 (10th Cir. 2015)). Petitioners' structural constitutional challenge is a question of law that we review de novo. *See SEC v. Blinder, Robinson & Co.*, 855 F.2d 677, 681 (10th Cir. 1988); *Bandimere v. SEC*, 844 F.3d 1168, 1171 (10th Cir. 2016).

## I.    Evidence Supporting the Final Rule

Petitioners first contend the Commission erred in its cost-benefit analysis. Under the CPSA, the Commission must conduct a two-step regulatory analysis of costs and benefits before adopting a new safety standard. 15 U.S.C. § 2058(f); *see also Zen Magnets*, 841 F.3d at 1147. First, the Commission must determine (1) "the degree and nature of the risk of injury the rule is designed to eliminate or reduce;" (2) the number of products that would be subject to the rule; (3) the public's need for the products and the effect of the rule on "utility, cost, or availability of such products"; and (4) "any means of achieving the objective of the order while minimizing adverse effects on competition or disruption or dislocation of manufacturing and other commercial practices consistent with the public health and

---

[5] Petitioners insist that the CPSA's substantial-evidence standard of review is more stringent than the APA's overarching arbitrary-and-capricious standard that typically applies to agency actions. However, we have recognized that "[w]hen the arbitrary[-]or[-]capricious standard is performing th[e] function of assuring factual support, there is no substantive difference between what it requires and what would be required by the substantial[-]evidence test." *Zen Magnets*, 841 F.3d at 1148 n.8 (first and fourth alterations in original) (quoting *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1575 (10th Cir. 1994)).

safety." § 2058(f)(1). And it must use these findings to conduct a cost-benefit analysis of the proposed rule. § 2058(f)(2). Second, the Commission must balance those costs and benefits, adopting a rule only if it is "reasonably necessary to eliminate or reduce an unreasonable risk of injury" and is "in the public interest"; if existing voluntary standards are inadequate; if the benefits "bear a reasonable relationship to [the rule's] costs"; and if the "rule imposes the least burdensome requirement which prevents or adequately reduces the risk of injury." § 2058(f)(3)(A)–(F). Stated more simply, the overall analysis "involves 'a balancing test like that familiar in tort law: [t]he regulation may issue if the severity of the injury that may result from the product, factored by the likelihood of the injury, offsets the harm the regulation imposes upon manufacturers and consumers.'" *Zen Magnets*, 841 F.3d at 1147 (quoting *Southland Mower Co. v. Consumer Prod. Safety Comm'n*, 619 F.2d 499, 508–09 (5th Cir. 1980)).

Here, the Commission's balancing test revealed that the benefits of the rule far outweigh its costs. *See* Final Rule, 87 Fed. Reg. at 57784–85. First, the Commission calculated the societal cost of deaths and injuries from magnet ingestions. *Id.* at 57781. It primarily relied on data from the National Electronic Injury Surveillance System (NEISS), which contains reports from emergency-room visits. *Id.* at 57759–62; *see also* Proposed Rule, 87 Fed. Reg. at 1264. After isolating cases involving magnets, the Commission excluded incidents involving no ingestion or where it was uncertain that ingestion occurred. Proposed Rule, 87 Fed. Reg. at 1264–65; *see also* Final Rule, 87 Fed. Reg. at 57760. The Commission also excluded from this portion

8

of its analysis any ingestions of magnets that could not be definitively identified as subject magnet products. Final Rule, 87 Fed. Reg. at 57780. Relying only on reports that could be clearly linked to the subject magnet products, the Commission determined that from 2017 to 2021, there was an annual average of more than 700 magnet-ingestion injuries treated by medical professionals. *Id.* at 57781. Accounting for medical costs, work losses, and intangible costs associated with these incidents, the Commission calculated an annual societal cost of $51.8 million. *Id.* at 57780.

The Commission also separately calculated the societal cost of the incidents involving unidentified magnets at an additional $167.9 million. *Id.* Although this number was not used for the primary cost-benefit analysis, the Commission did include it in a sensitivity analysis "to illustrate the theoretical upper bounds of benefits" from the final rule. *Id.* It did so because it reasoned that these unidentified incidents likely did involve subject magnet products, based on experts' analysis of NEISS data, detailed reports filed in the Consumer Product Safety Risk Management System, and reports from poison-control centers. *Id.* Additionally, magnet ingestion rates fell under the previous rule covering magnet sets and then surged after that rule was vacated, suggesting that most incidents—even those categorized as unidentified—involved magnet sets (which are one kind of subject magnet products). *Id.* at 57760.

The Commission then calculated the costs of the rule, estimating both lost use value to consumers who otherwise would have purchased the magnets and lost income and profits for manufacturers, importers, and retailers. *Id.* at 57782. The

Commission noted it could not "estimate precisely either consumer surplus or producer surplus; nor were any such data provided in response to the [proposed rule]'s request for such information." *Id.* at 57783. Therefore, the Commission ran several analyses based on different producer surpluses and prices that consumers would be willing to pay, resulting in a calculation of costs ranging from $2 million to $35 million. *Id.* at 57784. Considering that the Commission's most conservative estimate of the societal cost of magnet ingestions was $51.8 million, it concluded that "for all scenarios examined, the potential benefits well exceed[ed] the estimated costs of the rule." *Id.*

Challenging this analysis, petitioners argue the Commission erred in both quantifying and weighing the costs and benefits. Specifically, they contend the Commission incorrectly analyzed magnet-ingestion data, failed to account for its own reduced enforcement efforts, relied on guesswork for its cost estimation, did not give weight to voluntary industry standards, and created an underinclusive and arbitrary rule. We address each argument in turn.

## A.    Magnet-Ingestion Data

Petitioners first contend the Commission miscalculated the risk of injury by incorrectly analyzing magnet-ingestion data.[6] They initially suggest the

---

[6] The Commission argues that because petitioners did not raise these arguments during the rulemaking process, they are waived. *See Nutraceutical Corp. v. Von Eschenbach*, 459 F.3d 1033, 1041 n.9 (10th Cir. 2006) ("In a review of the decision of an administrative agency, a party waives its right to appeal an issue if it fails to object through comments or documents in the record."). To the extent this is true (and petitioners do not meaningfully refute it in their reply brief), we

Commission's "key basis" for adopting the rule was data showing an increase in ingestions after we vacated the previous rule. Aplt. Br. 16. This, petitioners argue, is merely evidence of correlation, not causation, thus falling short of the substantial-evidence standard. But petitioners misinterpret the Commission's analysis. To be sure, the Commission did note the historical data showing that when the earlier rule was in effect, ingestions decreased, and after the prior rule was vacated, ingestions increased. But contrary to petitioners' argument, this was not the "key basis" for the Commission's new rule. *Id.* Instead, the Commission merely noted this historical trend when explaining why it believed many of the unidentified-magnet ingestions likely involved subject magnet products. And this was far from the crux of the Commission's analysis given that, as noted above, the Commission did not rely on those unidentified ingestions for its primary analysis.

Petitioners relatedly fault the Commission for failing to disaggregate magnet ingestions from a purported increase in *all* small-item ingestions over the same period. *See Zen Magnets*, 841 F.3d at 1151 ("An agency may not simply ignore without analysis important data trends reflected in the record."). Here, petitioners misinterpret not only the Commission's analysis but also their own data. As shown in the graph petitioners provide in their brief, the increase in magnet ingestions noted by the Commission began in 2017, *before* the increase in small-item ingestions that

---

nevertheless exercise our discretion to address petitioners' arguments. *See ORP Surgical, LLC v. Howmedica Osteonics Corp.*, 92 F.4th 896, 923 (10th Cir. 2024) ("[W]e retain discretion to reach the merits of any unpreserved issue.").

petitioners highlight. Aplt. Br. 18. Additionally, petitioners ignore that the Commission relied not only on data showing an increase of ingestions beginning in 2017, but also on data showing that magnet ingestions decreased when the prior rule was announced and in effect. *See* Final Rule, 87 Fed. Reg. at 57762. Because magnet ingestions increased before the overall rate did and because magnet-ingestion decreases coincided with the prior rule, the Commission did not abdicate its duty to explain "important data trends reflected in the record." *Zen Magnets*, 841 F.3d at 1151. So these overarching challenges to the Commission's assessment of the magnet-ingestion data fall flat.

Petitioners next take aim at the Commission's risk-of-injury assessment, arguing that it is unreliable. In particular, they contend that the Commission should have sifted out single-magnet ingestions from its data because the magnets are only dangerous if at least two magnets or one magnet and one ferromagnetic object are swallowed. They also note that the Commission failed to identify the strength of the magnets involved in incidents.

Agencies often lack "perfect empirical or statistical data." *Fed. Commc'ns Comm'n v. Prometheus Radio Project*, 592 U.S. 414, 427 (2021). Rather than demanding agencies create "their own empirical or statistical studies," we ask that they acknowledge any limitations in their data and "reasonably consider[] the relevant issues and reasonably explain[] the decision." *Id.* at 423, 425, 427. *Zen Magnets* noted that the "acceptable degree of uncertainty" would depend on "the inherent factual uncertainties in a given context." 841 F.3d at 1152. There, for

12

instance, an unacceptable degree of uncertainty existed where the data showed 90% of injury reports only "possibly" involved subject magnet sets. *Id.*

Here, the Commission certainly lacked "perfect empirical or statistical data," *Prometheus Radio Project*, 592 U.S. at 427, but that is simply because this context includes "inherent factual uncertainties." *Zen Magnets*, 841 F.3d at 1152. The NEISS database, which petitioners do not dispute is a reliable source for nationwide estimates, includes brief narratives of injuries rather than accounts featuring the granularity that petitioners demand. As the Commission explained, this is because emergency-room physicians "are focused on information needed to treat the victim (e.g., that a magnet was ingested), rather than the specific product involved."[7] Proposed Rule, 87 Fed. Reg. at 1274. And the Commission repeatedly noted the limitations of the data it had, describing its overall assessment of the rule's benefits in reducing the cost of the harm caused by the subject magnet products as "uncertain." Final Rule, 87 Fed. Reg. at 57784.

Moreover, we are persuaded by the Commission's argument that it is highly unlikely that single or low-flux magnet ingestions drove the cost of the harm identified. The Commission's analysis counted not only the number of ingestions but also the cost of those incidents. *See id.* at 57780–81. Recall that the greatest danger— and most likely reason for hospitalization—stems from ingesting multiple high-

---

[7] To bolster its analysis, the Commission also considered reports from the Consumer Product Safety Risk Management System, which contain more detail but "cannot be used for generating nationally representative estimates" because they are "anecdotal." Final Rule, 87 Fed. Reg. at 57762.

powered magnets or a single magnet and a ferromagnetic object that attempt to connect within the digestive tract.[8] *See id.* at 57758. Cases where children were admitted to hospitals for treatment represented $41.7 million out of the $51.8 million in societal costs. *Id.* at 57781. As the Commission argues, if swallowing multiple strong magnets presents the most danger, it logically follows that the most expensive injuries came from multiple, not single, ingestions of high-powered magnets. In fact, petitioners even acknowledge as much, "conced[ing] that cases where medical intervention beyond mere imaging becomes necessary are likely more expensive than ones that involve solely diagnostic tests and eventual spontaneous resolution." Aplt. Br. 24 n.8. Therefore, the failure to exclude single-magnet ingestions or identify magnet strength does not undermine the Commission's injury analysis.

### B.    The Commission's Enforcement Efforts

Petitioners next argue that the Commission failed to account for its own reduced enforcement efforts as a likely cause of the increase in injuries after the prior rule was vacated. They contend that more robust enforcement of existing standards would sufficiently reduce injuries, rendering the rule not "reasonably necessary to eliminate or reduce an unreasonable risk of injury associated" with the magnets. § 2058(f)(3)(A). Yet the record rebuts petitioners' claims of reduced enforcement. From January 2010 through May 2022, the Commission conducted 20 recalls of

---

[8] Indeed, medical experts note that such ingestions "cause life-threatening injuries to children," and describe magnet ingestion as "a pediatric healthcare crisis." Am. Acad. of Pediatrics et al. Amicus Br. at 6–7 (formatting omitted).

hazardous magnet products, totaling over 13.8 million units. *See* Final Rule, 87 Fed. Reg. at 57773. The Commission also publicized safety alerts and created a "Magnets Information Center" website with links to recalls, descriptions of the hazard, and instructions on next steps if a child ingests a magnet. *Id.*

Further, in its final analysis, the Commission explained why various enforcement efforts would not eliminate or reduce the unreasonable risk of injury. For example, warnings on product packaging are insufficient because children often obtain loose magnets that have been separated from their labels. *See id.* at 57768. And recalls have proven ineffective, the Commission logically points out, because they occur only after products have been sold that could potentially injure children. In fact, one of petitioners' own examples of the Commission's alleged failure to enforce further demonstrates the shortcomings of recalls. Petitioners note that imitations of one recalled magnet product are still available online, suggesting the Commission is failing to "intercept items at the border that are unlawful to sell here." Aplt. Br. 28. But the nature of recalls is that they target individual products from specific manufacturers, so as one product disappears, an imitation can appear in its place. Final Rule, 87 Fed. Reg. at 57774. Thus, the Commission did consider enforcement efforts, and it adequately explained why they were insufficient.

C.   **Estimating the Cost of the Rule**

Petitioners next turn to the other side of the equation, arguing that the Commission's estimate of the costs of the rule was "mere guesswork." Aplt. Br. 30 (formatting and capitalization omitted). They note the Commission itself admitted

that it "cannot estimate with any precision the use value that consumers receive from these products" and that "actual sales levels of non[]complying subject magnet products are not known with certainty." Final Rule, 87 Fed. Reg. at 57782–83. But in so doing, the Commission specifically noted that no party responded to its request for such data. *See id.* at 57783 ("[The Commission] cannot estimate precisely either consumer surplus or producer surplus; nor were any such data provided in response to the [proposed rule]'s request for such information."). And the Supreme Court has upheld agency rules based on "sparse record evidence" where commenters had an opportunity to provide more accurate data but failed to do so. *Prometheus Radio Project*, 592 U.S. at 427–28. In *Prometheus Radio Project*, the FCC "repeatedly ask[ed] for data" on minority and female ownership of television stations, but when commenters did not provide such data, the FCC "relied on the data it had (and the absence of any countervailing evidence) to predict that changing the rules was not likely to harm minority and female ownership." *Id.* at 425. The Court concluded that "[i]n the absence of additional data from commenters, the FCC made a reasonable predictive judgment based on the evidence it had." *Id.* at 427.

Here, like the FCC in *Prometheus Radio Project*, the Commission made a "reasonable predictive judgment based on the evidence it had." *Id.* Using a wide range of possible sales figures, the Commission determined that the benefits always outweighed the costs of the rule. And in so doing, the Commission acknowledged the gaps in its data, supporting the conclusion that its analysis was reasonable. *See id.* at 425.

16

Petitioners further argue that the Commission failed to weigh the cost to individual consumers who may want to purchase sets for educational, research, and professional purposes, given that the exemption for educational and research purposes only applies to school educators, researchers, and other commercial users. *See* Final Rule, 87 Fed. Reg. at 57757; § 1262.2(b). But this argument lacks merit, as the Commission plainly considered "educational, social, [and] innovative" uses when calculating the costs of the rule for consumers. Final Rule, 87 Fed. Reg. at 57782. In so doing, it again noted that although it was impossible to "estimate with any precision the use value that consumers receive from these products," its model of such value considered all uses of the subject magnet products. *Id.* Accordingly, petitioners' cost arguments fail.

### D.    Voluntary Standards

Petitioners also contend that the Commission failed to adequately consider the efficacy of existing voluntary standards. Before adopting a rule, the Commission must conclude that "compliance with [a] voluntary consumer product safety standard is not likely to result in the elimination or adequate reduction of such risk of injury" or that "it is unlikely that there will be substantial compliance" with such a standard. § 2058(f)(3)(D). The Commission is required to consider each voluntary standard individually and also "in combination" with the others. § 2058(b)(1).

Here, the Commission analyzed the efficacy of four domestic and two international standards. *See* Final Rule, 87 Fed. Reg. at 57765. Two of the domestic standards, ASTM F963–17 and ASTM F2923–20, have the same size and strength

17

requirements as the final rule at issue here. But the former applies only to toys marketed to children under 14, and incident data indicates "children and teens commonly access and ingest magnets from products intended for older users." *Id.* Meanwhile, the latter excludes certain children's jewelry intended for children eight and older and does not apply to products intended for users 14 and up that younger children may nevertheless access. *Id.* at 57776. Two other domestic standards, ASTM F2999–19 and ASTM F3458–21, specify labeling requirements, but as the Commission notes, "caregivers and children commonly do not heed warnings, and children and teens commonly access magnets that are separated from their packaging." *Id.* at 57767. And the two international standards limit the size and strength of magnets in toys for children under 14, leaving out products intended for older children. *Id.* at 57769.

After analyzing these shortcomings, the Commission concluded that these existing standards collectively fell short because each "contains critical inadequacies," and the standards largely do not cover magnet sets, toys, or jewelry kits intended for users aged at least 14. *Id.* Thus, it concluded, "even industry compliance with *all* the existing standards, were it achieved, would not adequately address the ingestion hazard." *Id.* at 57769–70.

Petitioners contend the Commission logically erred when it concluded that because each standard was individually inadequate, all of them together were as well. But the problems the Commission identified with each voluntary labeling standard highlight the weaknesses of warnings on packaging as a whole. Further, even with

18

total compliance, the existing standards would leave a gaping hole in the regulatory regime: there would be no limits on the size and strength of magnet products intended for children 14 and older, even though, as the Commission explained, children commonly ingest magnets intended for these older users. Final Rule, 87 Fed. Reg. at 57765. In sum, the voluntary standards are limited in scope, fail to cover all products causing injuries and death, and have unknown levels of compliance. *See id.* at 57785. Therefore, the Commission reasonably concluded these standards would not adequately reduce the risk of injury or death.

### E.   Underinclusive Nature of the Rule

Petitioners' final argument specific to the rule is that it is underinclusive and therefore arbitrary. In support, petitioners contend that high-powered magnets in home and kitchen products cause a similar quantity of injuries as high-powered magnets in jewelry products, but only the latter are subject to the rule. Petitioners fault the Commission for failing to explain this distinction. Yet the Commission *did* explain its decision to omit home and kitchen products. In the proposed rule, the Commission noted that home and kitchen magnets, such as shower curtain magnets, are "likely to be part of common household products." Proposed Rule, 87 Fed. Reg. at 1290. And because such products "are not intended for amusement or jewelry," they are "less conspicuous, accessible, and appealing to children and teens." *Id.* For the same reason, caregivers would be "less likely to give" such products to children. *Id.* Similarly, in its final analysis, the Commission explained that it chose to focus on products likely to "appeal to children and teens." Final Rule, 87 Fed. Reg. at 57774.

Thus, the Commission did explain why it chose not to include home and kitchen magnets in the rule.

To summarize, the data supporting the final rule is not perfect. But it need not be—and likely never will be—more precise. The Commission continually highlighted the existing uncertainties and provided ranges of figures for its cost-benefit analysis to account for those uncertainties. Its new analysis directly responds to the flaws highlighted in *Zen Magnets*, and for all scenarios examined, the benefits outweighed the costs. Given this reasoned analysis and the deferential nature of our review, we hold the final rule is supported by substantial evidence.

## II.    Constitutionality of the Commission's Structure

Lastly, petitioners challenge the constitutionality of the Commission's structure. The Commission comprises five commissioners who serve staggered seven-year terms and can be removed by the President for "neglect of duty or malfeasance in office but for no other cause." 15 U.S.C. § 2053(a), (b)(1)(B). Petitioners argue this limitation on the President's removal power violates the separation of powers.

We recently rejected an identical challenge to the Commission's structure. *See Leachco, Inc. v. Consumer Prod. Safety Comm'n*, 103 F.4th 748, 760 (10th Cir. 2024), *cert. denied*, No. 24-156, 2025 WL 76435 (Jan. 13, 2025).[9] As we noted there,

---

[9] We abated this appeal pending a decision in *Leachco*, and once that decision issued, we lifted the abatement, ordered supplemental briefing, and scheduled oral argument. When the appellant in *Leachco* filed a petition for certiorari, we ordered additional briefing as to whether this case should again be abated pending the

"[s]ince the Supreme Court's decision in *Humphrey's Executor*[ *v. United States*, 295 U.S. 602 (1935)], the constitutionality of independent agencies, whose officials possess some degree of removal protection that insulates them from unlimited and instantaneous political control, has been uncontroversial." *Leachco*, 103 F.4th at 760; *see also id.* at 761 ("Importantly, the Supreme Court in *Seila Law* [*LLC v. Consumer Fin. Protection Bureau*, 591 U.S. 197 (2020),] clearly stated that *Humphrey's Executor* remains binding today."); *Morrison v. Olson*, 487 U.S. 654, 724–25 (1988) (Scalia, J., dissenting) (explaining that "removal restrictions have been generally regarded as lawful for so-called 'independent regulatory agencies,' such as . . . the Consumer Product Safety Commission"). To be sure, as petitioners highlight in their supplemental brief, *Leacho* assessed the constitutionality of the Commission's structure under the preliminary-injunction standards of likelihood of success on the merits and irreparable harm. *See* 103 F.4th at 752. But the difference in procedural posture does not dictate a different result here. The *Leachco* appellants failed to demonstrate irreparable harm because "our own binding precedent" and "the general weight of authority" support the Commission's structure. *Id.* at 763. That continues to be the case, so we again affirm the constitutionality of the Commission's removal protections.[10]

---

Supreme Court's decision. Both parties indicated that oral argument should proceed, and shortly after we held argument, the Supreme Court denied certiorari.

[10] After oral argument, the government notified us that, pursuant to guidance from the new Acting Solicitor General, it had changed its position on this issue and now agrees with petitioners that the Commissioners' removal protections are

**Conclusion**

Responding to a serious health risk for children, the Commission carefully crafted a safety standard for magnets of a certain size and strength that is more beneficial than costly. Because this rule is supported by substantial evidence and the Commission is constitutionally structured, we deny this petition for review.

---

unconstitutional. Even if the government had developed an argument to support its new position, we are bound by our precedent to affirm the constitutionality of the Commission's structure.